## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Northland Baptist Church of St. Paul, Minnesota; John Bruski; Living Word Christian Center; Glow In One Mini Golf, L.L.C.; Aaron Kessler; Myron's Cards and Gifts, Inc.; Larry Evenson; The A J Hulse Company; Andrew Hulse; Gay Bunch-Hulse,<br><br>        Plaintiffs,<br><br>    v.<br><br>Governor Tim Walz, individually and in his official capacity; and Attorney General Keith Ellison, in his official capacity,<br><br>        Defendants. | Court File No. 20-CV-1100-WMW-BRT<br><br><br><br>**SECOND AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.      In Emergency Executive Order 20-01 on March 13, 2020, Governor Tim Walz declared a "peacetime emergency" in Minnesota due to the spread of COVID-19 in the United States and the existence of 14 confirmed cases in Minnesota. Since then, and as of June 18, 2020, Governor Walz has issued 68 "emergency executive orders" ("EOs") pursuant to the authority he claims to have under Chapter 12 of the Minnesota Statutes related to the COVID-19 pandemic.

2.      EOs 20-01, 20-04, 20-08, 20-18, 20-20, 20-33, 20-35, 20-38, 20-40, and 20-48 totally shut down some businesses, schools, and places of worship across Minnesota—while allowing others to remain open. The consequences of these EOs were

devastating for the Plaintiffs, other Minnesota businesses, and places of worship. More than 750,000 Minnesotans have been forced to apply for unemployment since Governor Walz began selectively shutting down Minnesota's economy.

3.     On May 13, 2020, Governor Walz issued EO 20-56, which supplanted the prior shutdown EO 20-48. EO 20-56 allowed most retail businesses to open on May 18, 2020, with certain restrictions, and anticipated that hair salons like Plaintiff A J Hulse Company would be allowed to open June 1, 2020, with certain restrictions. EO 20-56 failed to allow religious institutions like Plaintiffs Northland Baptist Church of St. Paul and Living Word Christian Center to hold gatherings of more than 10 people, while it allowed "commercial activity by workers and customers of Critical and Non-Critical businesses." EO 20-56 even contemplated that malls, like the Mall of America, could be open so long as people observe social distancing and the mall observes sanitation guidelines. There was and is ***no reason*** that someone should be able to go to the Mall of America but not Living Word Christian Center with the same rules in place.

4.     In addition, the Minnesota Department of Employment and Economic Development developed a list of "Critical" businesses that spanned 24 pages, with page after page including exceptions from the lockdown rule—but not places of religious worship and not apparently disfavored "non-Critical" businesses.

5.     Worshippers across Minnesota were prohibited from assembling to celebrate Easter and the Passover, while liquor stores remained open. Target, Walmart, Walgreens, and CVS were open, while local Hallmark stores were closed. Golf courses and bait shops are open, but indoor amusement facilities were shut. Nobody could legally

get a haircut, but dogs could be groomed. Businesses in Minnesota were and continue to be forced to carry rent obligations, loan payments, and tax obligations without relief and without income. Those businesses' landlords, in turn, have not been able to collect rent from tenants who cannot afford to pay it.

6.      In the wake of threatened acts of civil disobedience by worshippers across the state and this lawsuit, Governor Walz issued EO 20-62, which amended EO 20-56 and allowed places of worship to reopen for services with up to 25% capacity, a maximum of 250 people in any self-contained space, a COVID-19 preparedness plan, and while following social distancing protocol. EO 20-62 still treated religious institutions differently than even "non-critical" commercial entities.

7.      Thereafter, on May 27, 2020, Governor Walz gathered the regulations of EOs 20-04, 20-08, 20-18, 20-52, 20-56, and 20-62 into EO 20-63 and rescinded the prior EOs.

8.      On June 5, 2020, as a part of his ever-changing rule by decree, Governor Walz allowed some "non-critical" and religious entities to gather at 50% of indoor capacity, and others to gather at 25% of capacity, while "critical" businesses are not subject to those restrictions. This new regime started June 10.

9.      Governor Walz chose this course of action even though there was no federal directive requiring states to shut down their economies to respond to COVID-19. The Cybersecurity and Infrastructure Security Agency Guidance that the governor cited in his Orders does not require or recommend shutting down entire economies to stop COVID-19; rather, it emphasizes the importance of keeping certain businesses *open*. The

Center for Disease Control's Community Mitigation Framework proposed common-sense measures to reduce spread and keep people safe: (1) wash your hands, (2) cover your face from coughs, (3) maintain physical distance from others and stay at home when you can, and (4) clean surfaces regularly. The CDC's guidance states that some restrictions on businesses may be needed, but it does not mention that businesses must or should be closed to slow COVID-19. Yet, Governor Walz chose a draconian shutdown that picked winners and losers, with devastating effects.

10.    To enforce this unconstitutional scheme, Governor Walz threatened criminal penalties for individuals, businesses, and places of worship who failed to comply with the EOs, despite not having the statutory authority to impose penalties against businesses or places of worship. Governor Walz even "deputized" Attorney General Keith Ellison, threatening penalties of up to $25,000 never before applied to alleged violations of Chapter 12 under Minnesota Statutes section 8.31. Governor Walz' orders state that city and county attorneys can proceed under section 8.31 as well, even though the law does not authorize it. These threatened penalties intimidated Plaintiffs into not exercising their First and Fourteenth Amendment rights for fear of criminal prosecution. News reports indicated that, as of late May 2020, as many as 88 people had been charged with violations of the EOs by law enforcement responsible for prosecution of violations of the EOs, and AG Ellison brought a civil action against a St. Cloud-area bar chain.

11.    Had the governor instead adhered to his obligations to "support the Constitution of the United States and the Constitution of the State of Minnesota," as required by his oath of office, most of these damages could have been avoided. Simply

put, Governor Walz' scheme of selecting economic "winners and losers" and wholly shutting down some businesses without authority under Minnesota law violates the Plaintiff businesses' 14th Amendment due process and equal protection rights. Governor Walz' actions constitute a taking under the Fifth Amendment and Minnesota statute for which the State must now pay. And, Governor Walz' unequal treatment of worshippers gathering violates churches' and individuals' First Amendment rights. Plaintiffs are entitled to money damages and declaratory and injunctive relief because of Governor Walz' unconstitutional conduct.

## **PARTIES**

12.    Plaintiff Northland Baptist Church of St. Paul, Minnesota is a Minnesota nonprofit corporation. Northland Baptist Church of St. Paul, Minnesota's registered office address is 1320 Rice St., St. Paul, Ramsey County, Minnesota. Northland Baptist Church holds services at 104 Ivy Ave. W in St. Paul, Ramsey County, Minnesota.

13.    Plaintiff John Bruski is an individual who resides in Ramsey County, Minnesota.

14.    Plaintiff Living Word Christian Center is a Minnesota nonprofit corporation. Living Word Christian Center's registered office address is 9201 75th Ave. N, Brooklyn Park, Hennepin County, Minnesota. Living Word Christian Center holds services in Brooklyn Park, St. Paul, and Rogers, Minnesota.

15.    Plaintiff Glow In One Mini Golf, L.L.C. is a Minnesota limited liability company. Glow In One Mini Golf, L.L.C.'s registered office address is 10150 City Walk Drive #329 in Woodbury, Washington County, Minnesota. Glow In One Mini Golf,

L.L.C.'s business location is in Blaine, Anoka County, Minnesota.

16.     Plaintiff Aaron Kessler is an individual who resides in Ramsey County, Minnesota.

17.     Plaintiff The A J Hulse Company is a Minnesota corporation. The A J Hulse Company's registered office address is 12063 Elm Creek Blvd. N., Maple Grove, Hennepin County, Minnesota.

18.     Plaintiff Andrew Hulse is an individual who resides in Sherburne County, Minnesota.

19.     Plaintiff Gay Bunch-Hulse is an individual who resides in Sherburne County, Minnesota.

20.     Plaintiff Myron's Cards and Gifts, Inc. is a Minnesota corporation. Myron's Cards and Gifts, Inc.'s registered office address is 1306 County Rd. F West, Suite 130, Arden Hills, Ramsey County, Minnesota. Myron's Cards and Gifts, Inc. has locations in Bloomington (Hennepin County), Roseville (Ramsey County), Coon Rapids (Anoka County), Blaine (Anoka County), and Mankato (Blue Earth County).

21.     Plaintiff Larry Evenson is an individual who resides in Ramsey County, Minnesota.

22.     Defendant Tim Walz is the governor of the State of Minnesota. His office address is 130 State Capitol, 75 Rev. Dr. Martin Luther King Jr. Blvd., Saint Paul, Minnesota 55155. Plaintiffs' claims are against Governor Walz individually and in his official capacity as governor.

23.     Defendant Keith Ellison is the attorney general of the State of Minnesota.

His office address is 445 Minnesota Street, Saint Paul, Minnesota 55101. Plaintiffs' claims are against Attorney General Ellison in his official capacity only.

## JURISDICTION AND VENUE

24.    The Court has personal jurisdiction over the defendants, who reside in Minnesota and committed the acts alleged in this Complaint in Minnesota.

25.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

26.    Venue is proper because a substantial part of the events giving rise to the claims occurred in the district of Minnesota. *See* 28 U.S.C. § 1391(b)(2).

## STATEMENT OF THE CLAIM

### The Executive Orders' Structure and Enforcement Schemes

*Executive Order 20-01*

27.    On March 13, 2020, Governor Walz issued Emergency Executive Order 20-01. A copy of this order is attached to this Complaint as Exhibit A.

28.    EO 20-01 declares a peacetime emergency in Minnesota because of the COVID-19 pandemic.

29.    EO 20-01 states that "[l]ocal resources are inadequate to fully address the COVID-19 pandemic." The Order does not state what local resources would be needed to "fully address the COVID-19 pandemic" or what local resources were available.

30.    At the time Governor Walz issued EO 20-01, there were 14 confirmed cases of COVID-19 in Minnesota.

31.    EO 20-01 states that it is effective under Minn. Stat. § 4.035, subd. 2, and

its duration is governed by Minn. Stat. 12.31, subd. 2.

32.    EO 20-01 does not contain a severability provision.

***Executive Order 20-04***

33.    On March 16, 2020, Governor Walz issued Emergency Executive Order 20-04. A copy of this Order is attached to this Complaint as Exhibit B.

34.    EO 20-04 closed a number of lawful Minnesota businesses, including restaurants and other places of public accommodation offering food or beverage for on-premises consumption, bars, breweries, cigar bars, theaters, gyms, other exercise studios, amusement parks, bowling alleys, country clubs, golf courses, and other establishments of the like.

35.    These businesses were forced to close by 5:00 PM on March 17, 2020.

36.    EO 20-04 allowed these businesses to provide services through delivery or take-out means.

37.    EO 20-04 excepted from its scope grocery stores, convenience stores, pharmacies, health care facilities, soup kitchens, and a few others.

38.    EO 20-04 states the source of its authority as Minn. Stat. § 12.21, subd. 3(1), and quotes part of that statute: "the Governor 'may make, amend, and rescind the necessary orders and rules to carry out the provisions' of Minnesota Statutes, Chapter 12." But EO 20-04 neglects to quote the next line in that statutory provision: "within the limits of the authority conferred by this section, with due consideration of the plans of the federal government . . . ."

39.    EO 20-04 does not explain how closure of some Minnesota restaurants,

bars, and other like businesses, but keeping open others of like nature, will accomplish mitigation of community spread of COVID-19 or whether there are available less restrictive means by which that goal might be accomplished.

40.     EO 20-04 states a concern for overwhelming health care facilities needed to combat COVID-19, but presents no factual information that would indicate that persons ill with COVID-19 could not be serviced by local resources where they live in Minnesota.

41.     EO 20-04 states that it may be enforced pursuant to Minn. Stat. § 12.45 as to "persons," but does not state a separate penalty for businesses failing to comply. EO 20-04 threatens a penalty for violation of up to 90 days in jail and up to a $1,000 fine.

42.      EO 20-04 does contain a severability provision and invites a Court to 'blue pencil' the Order if part of it is deemed to be invalid.

***Executive Order 20-08***

43.     On March 18, 2020, Governor Walz issued Emergency Executive Order 20-08. A copy of this Order is attached to this Complaint as Exhibit C.

44.     EO 20-08 amended EO 20-04 to include, relevant here, cosmetology salons and barber shops.

45.     EO 20-08 was effective immediately and did not provide any lead time for compliance.

***Executive Order 20-18***

46.     On March 18, 2020, Governor Walz issued Emergency Executive Order 20-18. A copy of this Order is attached to this Complaint as Exhibit D.

47.     EO 20-18 extended the closure of places of accommodation set forth in EO 20-04 and 20-08 until May 1, 2020.

***Executive Order 20-20***

48.     On March 25, 2020, Governor Walz issued Emergency Executive Order 20-20. A copy of this Order is attached to this Complaint as Exhibit E.

49.     EO 20-20 forced Minnesotans to stay at home except for Critical Sector Work and Activities outlined in paragraphs 5 and 6 of that Order.

50.     Paragraph 5 allows for the following activities, in relevant part:

    a.   Seek emergency services;

    b.   Obtain medical services, supplies, and medications;

    c.   Visit a health care or dental facility or veterinarian;

    d.   Obtain groceries;

    e.   Obtain alcoholic beverages;

    f.   Obtain supplies needed to work from home;

    g.   Visit laundromats and dry cleaners.

51.     Paragraph 6 allows the following "Critical Sector" workers (relevant to this action) to continue working despite the Order:

    a.   Health care workers listed in the CISA guidance, which includes dentists;

    b.   Providers of "reproductive health care," which includes abortions, childbirth services, mental health care, and substance use treatment;

    c.   Workers in bicycle shops;

    d.   The news media;

e.  Officials, workers, and leaders in houses of worship and other places of religious expression or fellowship, and workers necessary to plan, record, and distribute online or broadcast content;

f.  Skilled trades like electricians, plumbers, HVAC technicians, elevator technicians, exterminators, janitorial staff, moving services, and security staff;

g.  Labor union essential activities, including the administration of health and welfare funds, and monitoring the wellbeing and safety of members providing services in the Critical Sectors;

h.  Laundry services;

i.  "Essential supply stores," which is limited to workers at businesses that sell products, tools, materials, or supplies necessary for: (1) the above Critical Sectors to continue their essential operations, (2) for workers to work from home, or (3) for the maintenance of the safety, sanitation, and essential operation of homes or residences.

52.     EO 20-20 did not allow businesses to operate even if they could provide services or sell goods with sanitary precautions that either keep people at least six feet apart, consistent with CDC guidelines, or prevent direct touching or communication of bodily fluids like saliva.

53.     EO 20-20 specifically prohibited public accommodations from providing services, even if they could be provided outside and in keeping with CDC guidelines.

54.     EO 20-20 claims that its authority is derived from Minn. Stat. §§ 12.02 and

12.21. Relevant here, Section 12.21, subd. 3(7) states: "In performing duties under this chapter and to effect its policy and purpose, the governor may: . . . cooperate with the president and the heads of the armed forces, the Emergency Management Agency of the United States and other appropriate federal officers and agencies, and with the officers and agencies of other states in matters pertaining to the emergency management of the state and nation, including the direction or control of: . . . (vi) the evacuation, reception, and sheltering of persons."

55.    EO 20-20 does not indicate that it is necessary to cooperate with any directive of the federal government or another state to shelter persons.

56.    EO 20-20 became effective on March 27, 2020 at 11:59 PM and was to expire on April 10, 2020 at 5:00 PM.

57.     EO 20-20 threatens a penalty for violation of up to 90 days in jail and up to a $1,000 fine under Minn. Stat. § 12.45. EO 20-20 does not state a separate penalty for businesses.

58.    After EO 20-20 was issued, the Minnesota Department of Employment and Economic Development ("DEED") issued guidance for what people and businesses are exempt from the EO. This document eventually spanned 24 pages as of May 3, 2020 with numerous changes throughout the coming weeks. A copy of this guidance is attached as Exhibit F.

***Executive Order 20-33***

59.    On April 8, 2020, Governor Walz issued Emergency Executive Order 20-33. A copy of this Order is attached to this Complaint as Exhibit G.

60.     EO 20-33 rescinded EO 20-20 and imposed a new requirement that persons shelter in place and extended the closure of public accommodations required by EO 20-04 and its amending Orders, both until May 3, 2020.

61.     Like EO 20-20, EO 20-33 prohibited public accommodations from providing outside services even if they could follow CDC guidelines related to sanitization and spacing.

62.     EO 20-33 continued to prohibit elective surgeries and procedures.

63.     EO 20-33 added new categories of "Critical Sector" workers, including the following:

    a.   Workers "supporting the medical cannabis industry";

    b.   Landscaping and lawn care workers;

    c.   Recreational vehicle and all-terrain vehicle sales that are "necessary to allow for essential travel or support Critical Sectors";

    d.   Workers needed to process hunting and fishing licenses;

    e.   EO 20-33 specified that, while financial sector workers were exempted, debt collection professionals were *not* part of that exemption;

    f.   Workers at gun stores, though ranges had to remain closed;

    g.   Workers cleaning common areas in apartments, but workers doing residential cleaning care of individual homes were not exempt;

    h.   Workers "supporting major appliance sales";

    i.   Process servers and legal couriers;

    j.   Workers supporting pet adoption and animal foster care so long as

13

paperwork is done online and social distancing is observed through the adoption process (but pet groomers are not exempt even if they can do the same);

k.  Workers supporting "minimum basic operations" in businesses, such as to preserve inventory, process payroll, and facilitate remote work.

64.  DEED made further amendments to its guidance attached as Exhibit G.

65.  EO 20-33 did not allow businesses to operate even if they could provide services or sell goods with sanitary precautions that either keep people at least six feet apart, consistent with CDC guidelines, or prevent direct touching or communication of bodily fluids like saliva.

66.  EO 20-33 specifically prohibited public accommodations from providing services, even if they could be provided outside and in keeping with CDC guidelines.

67.  EO 20-33 claims that its authority is derived from Minn. Stat. §§ 12.02 and 12.21. It cites the same provisions as EO 20-20 to support the authority to require sheltering in place, Section 12.21, subd. 3(7).

68.  EO 20-33 does not indicate that it is necessary to cooperate with any directive of the federal government or another state to shelter persons.

69.  EO 20-33 became effective on April 8, 2020 at 11:59 PM and was to expire on May 3, 2020 at 11:59 PM.

70.   EO 20-33 threatens a penalty for violation by individuals of up to 90 days in jail and up to a $1,000 fine for individuals under Minn. Stat. § 12.45.

71.  EO 20-33 also threatens a penalty for violation of up to a year of

imprisonment and a $3,000 fine for business owners without citing to any statutory authority for that higher penalty.

72.     EO 20-33 also threatens that the Attorney General and city and county attorneys may seek civil relief under Minn. Stat. § 8.31 of up to $25,000 per occurrence for businesses violating EO 20-33.

73.     Minn. Stat. § 8.31 does not reference Chapter 12 and only references the Attorney General's enforcement of consumer fraud type actions available in other Minnesota statutes. Minn. Stat. § 8.31 is titled, "Additional Duties of Attorney General" and does not authorize city or county attorneys to seek civil penalties.

***Executive Order 20-35***

74.     On April 13, 2020, Governor Walz issued Emergency Executive Order 20-35, which extended the peacetime emergency declared in EO 20-01 for 30 days, until May 13, 2020. A copy of this Order is attached to this Complaint as Exhibit H.

75.     EO 20-35 states that local resources are inadequate to address the threat of COVID-19, but the Order does not state what local resources would be needed to "fully address the COVID-19 pandemic" or what local resources were available.

***Executive Order 20-38***

76.     On April 17, 2020, Governor Walz issued Emergency Executive Order 20-38. A copy of this Order is attached to this Complaint as Exhibit I.

77.     EO 20-38 amends EO 20-33, 20-04, and 20-18, effective as of April 18, 2020 at 5:00 AM.

78.      EO 20-38 allows certain activities, including outdoor golfing, boating, and

fishing that were prohibited by prior EOs.

79.     EO 20-38 allows certain stores to open to support outdoor recreational facilities that had been force-closed before, including golf pro shops, marinas, docks, mooring services, pump-out stations, ATV and watercraft repair and sales facilities, lake service providers who provide docks and boatlifts, bait shops, and outdoor shooting ranges and game farms.

80.     EO 20-38 does not allow for indoor activities even if those indoor activities can comply with CDC guidelines for sanitization and social distancing.

***Executive Order 20-40***

81.     On April 17, 2020, Governor Walz issued Emergency Executive Order 20-40. A copy of this Order is attached to this Complaint as Exhibit J.

82.     EO 20-40 allows some workers to return to work, but requires that all workers who can work from home continue to do so. Among the workers allowed to return to work are the following:

   a.  Non-"Critical Sector" workers in industrial and manufacturing businesses;

   b.  Non-"Critical Sector" workers in office-based businesses whose work is "primarily" not customer-facing.

83.     DEED provided guidance as to reopening businesses, but that guidance does not define what businesses or jobs are "primarily" customer-facing. A copy of the guidance is attached as Exhibit K.

84.     EO 20-40 did not end the ban on retail stores, hair salons, or entertainment-

based businesses even if those businesses could operate by following federal CDC guidelines for sanitization and social distancing.

***Executive Order 20-48***

85.     On April 30, 2020, Governor Walz issued Emergency Executive Order 20-48. A copy of this Order is attached to this Complaint as Exhibit L.

86.     EO 20-48 replaced prior EOs and extended the shelter in place order through May 17, 2020 at 11:59 PM.

87.     EO 20-48 rescinded EOs 20-33, 20-38, 20-40, and 20-47 as of May 3, 2020 at 11:59 PM and became effective in their place as of May 3, 2020 at 11:59 PM.

88.     EO 20-48 essentially incorporated the orders it replaced, and includes the following exemptions:

> a.  People may leave home to pick up retail products from establishments offering curbside pickup services;
>
> b.  Weddings are now allowed so long as they are limited to 10 people or fewer and social distancing is observed;
>
> c.  Workers supporting bait harvesters;
>
> d.  Workers transporting boats;
>
> e.  Workers necessary to operate safe harbors and marinas;
>
> f.  Workers supporting car washes of cars' exteriors;
>
> g.  Workers supporting environmental compliance, habitat restoration, natural land and water management, and plant and animal population management;

h.  Workers at "traditional retail establishments" working to fulfill online orders for pickup and delivery;

i.  Workers supporting the sale of "essential furnishings," including beds and other furniture "necessary" for other workers to work from home;

j.  Workers who construct and repair decks and fences;

k.  Window cleaners, power washers of home exteriors, and gutter cleaning services;

l.  Workers supporting resorts in accordance with the outdoor recreation guidance;

m.  Workers supporting race tracks and horse training and stabling;

n.  Ski areas (now that it is May);

o.  Outdoor recreational equipment rental facilities;

p.  Retail businesses that sell, rent, maintain, and repair goods that can be picked up outside;

q.  Pet groomers if they can adhere to guidelines related to sanitization and social distancing; and

r.  Salons and barbershops *only* to sell retail products.

89.  EO 20-48 does not allow other businesses to operate indoors even if they can provide services or sell goods with sanitary precautions that either keep people at least six feet apart, consistent with CDC guidelines, or prevent direct touching or communication of bodily fluids like saliva.

90.  EO 20-48 specifically prohibits public accommodations from providing

18

services, even if they could be provided outside and in keeping with CDC guidelines, other than salons and barbershops selling retail products that can be picked up outside.

91.     EO 20-48 claims that its authority is derived from Minn. Stat. §§ 12.02 and 12.21. It cites the same provisions as EO 20-20 to support the authority to require sheltering in place, Section 12.21, subd. 3(7).

92.     EO 20-48 does not indicate that it is necessary to cooperate with any directive of the federal government or another state to shelter persons.

93.     EO 20-48 threatens a penalty for violation by individuals of up to 90 days in jail and up to a $1,000 fine for individuals under Minn. Stat. § 12.45.

94.     EO 20-48 also threatens a penalty for violation of up to a year of imprisonment and a $3,000 fine for business owners without citing to any statutory authority for that higher penalty.

95.     EO 20-48 also threatens that the Attorney General and city and county attorneys may seek civil relief under Minn. Stat. § 8.31 of up to $25,000 per occurrence for businesses violating EO 20-48.

96.     Minn. Stat. § 8.31 does not reference Chapter 12 and only references the Attorney General's enforcement of consumer fraud type actions available in other Minnesota statutes. Minn. Stat. § 8.31 is titled, "Additional Duties of Attorney General" and does not authorize city or county attorneys to seek civil penalties.

***Executive Order 20-56***

97.     On May 13, 2020, Governor Walz promulgated Emergency Executive Order 20-56. EO 20-56 does not extend the EO 20-48 "shutdown," but instead imposes a

19

ban on "gatherings" of more than 10 people.

98.    EO 20-56 states, in part, as follows:

c. Gatherings. All gatherings of more than 10 people are prohibited. Gatherings are groups of individuals, who are not members of the same household, congregated together for a common or coordinated social, civic, community, **faith-based**, leisure, or recreational purpose—even if social distancing can be maintained. This prohibition includes planned and spontaneous gatherings, public and private gatherings, and indoor and outdoor gatherings. Examples of prohibited gatherings include, but are not limited to, social, civic, community, **faith-based**, or leisure events, sporting or athletic events, performances, concerts, conventions, fundraisers, parades, fairs, and festivals that bring together more than 10 people from more than one household. **Prohibited gatherings do not include commercial activity by workers and customers of Critical and Non-Critical Businesses**.

99.    The bold language made it clear that while Plaintiff Northland and LWCC's church services would still be banned, other businesses could operate, and people could gather in other locations. Thus, on Sunday, one could not attend an in-person church service, but one could go to Target, then hit the liquor store at noon and visit the bait shop. In addition, one could not attend a Wednesday night service with more than 10 people, but one could work in a law office all day indoors and go to other indoor work places without a 10-person limitation. This kind of discrimination against religious exercise is unconstitutional.

***Executive Order 20-62***

100.    On May 23, 2020, in the wake of Minnesota Catholics and Lutherans' threatened civil disobedience and this lawsuit and the then-forthcoming TRO motion, Governor Walz amended EO 20-56.

101.    EO 20-62 allowed places of worship to reopen for in-person services so

long as a few criteria were met:

    a.   A minimum of 6 feet of physical distancing must be maintained between households in attendance;

    b.   Indoor occupancy cannot exceed 25% of normal occupancy, with a cap at 250 people in a self-contained space;

    c.   Outdoor events are capped at 250 people;

    d.   Places of worship have to develop a COVID-19 Preparedness Plan according to MDH regulations.

***Executive Order 20-63***

102.    On May 27, 2020, Governor Walz issued Executive Order 20-63.

103.    EO 20-63 essentially re-writes some of the above-described EOs into one document, with modifications.

104.    Under Paragraph 6 of EO 20-63, the following restrictions are in place:

    a.   No in-person gathering of more than 10 people not of the same household is allowed, except for "commercial activity by workers and customers of Critical and Non-Critical Businesses."

    b.   Weddings, funerals, and worship services may meet with more than 10 people, so long as they adhere to the restrictions enumerated in EO 20-62, described above.

105.    Under Paragraph 7 of EO 20-63, the following restrictions are in place:

    a.   "Places of Accommodation" are closed to the public except as otherwise stated in the EO, including restaurants, bars, coffee shops, theaters,

performance venues, gyms, indoor sports facilities, entertainment facilities, country clubs, and hair salons, nail salons, tattoo shops, and others.

b. Places of Accommodation "that offer food and beverage not for on-premises consumption" and drug stores, such as Wal-Mart, Target, CVS, and others, are open.

c. Barber shops and salons may partially open if they do not exceed 25% of capacity, workers wear face coverings, and they adhere to the requirements of "Non-Critical Businesses" in paragraph 7e of the EO.

d. Restaurants, cafes, bars, and other like establishments may partially open for outdoor dining with no more than 50 people and must follow the requirements of paragraph 7e and maintain physical distancing of 6 feet between tables.

e. "Critical Sector" businesses may still operate pursuant to the provisions of EO 20-48, described above.

f. Paragraph 7e describes what "Non-Critical" businesses must do to operate under the EO:

   i. Develop a COVID-19 Preparedness Plan;

   ii. Customer-facing businesses, such as stores in malls, must include provisions according to DEED guidance for customer safety;

g. Institutions of higher education may offer in-person classes consisting of no more than 10 people.

106.    Under Paragraph 8 of the EO, outdoor recreational facilities may operate so long as they adhere to DEED guidance.

107.    The DEED guidance for retail businesses, where people are gathered indoors, requires no more than 50% of occupancy allowed in the business' indoor physical location at any time, https://mn.gov/deed/assets/reopening-minnesotas-consumer-facing-businesses_tcm1045-431883.pdf.

***Executive Order 20-74***

108.    On June 5, 2020, Governor Walz issued Emergency Executive Order 20-74, which rescinded EO 20-63 and became effective on June 9, 2020 at 11:59 P.M.

109.    Under Paragraph 6 of EO 20-74, the following restrictions are in place:

    a.  No outdoor in-person gathering of more than 25 people not of the same household is allowed, except for "commercial activity by workers and customers of Critical and Non-Critical Businesses."

    b.  No indoor in-person gathering of more than 10 people not of the same household is allowed, except for "commercial activity by workers and customers of Critical and Non-Critical Businesses."

    c.  Weddings, funerals, and worship services may meet with more than 10/25 people, up to 250 people in a "single self-contained space" at 50% of the normal occupant capacity of the space and otherwise adhere to the restrictions enumerated in EO 20-62, described above.

110.    Under Paragraph 7 of EO 20-74, the following restrictions are in place:

    a.  "Places of Accommodation" that had been closed to the public except as

otherwise stated in the EO, including restaurants, bars, coffee shops, theaters, performance venues, gyms, indoor sports facilities, entertainment facilities, country clubs, and hair salons, nail salons, tattoo shops, and others, are now allowed to open pursuant to instructions on the "Stay Safe Minnesota website (https://staysafe.mn.gov)."

b. Those restrictions allow the Places of Public Accommodation that had been closed to reopen with up to 250 occupants with occupant capacity of 25% of that normally allowed by the fire marshal's designation. https://mn.gov/deed/assets/recreational-entertainment-industry-guidance-acc_tcm1045-434886.pdf, p. 6. These Places of Public Accommodation must follow 9 pages of detailed guidance and restrictions, along with the requirements of "Non-Critical Businesses" in paragraph 7e of the EO.

c. Places of Accommodation "that offer food and beverage not for on-premises consumption" and drug stores, such as Wal-Mart, Target, CVS, and others, are open without restriction, except that they have to create a COVID-19 Preparedness Plan by June 29, 2020. https://mn.gov/covid19/for-minnesotans/stay-safe-mn/stay-safe-plan.jsp (last visited June 16, 2020).

d. Barber shops and salons can partially open if they do not exceed 50% of capacity, workers wear face coverings, and they adhere to the

requirements of "Non-Critical Businesses" in paragraph 7e of the EO.

e.  Restaurants, cafes, bars, and other like establishments may partially open for outdoor dining with no more than 250 people and must follow the requirements of paragraph 7e and maintain physical distancing of 6 feet between tables.

f.  Restaurants, cafes, bars, and other like establishments may partially open for indoor dining with no more than 250 people at 50% of normal occupancy and must follow the requirements of paragraph 7e and maintain physical distancing of 6 feet between tables.

g.  "Critical Sector" businesses may still operate pursuant to the provisions of EO 20-48, described above.

h.  Paragraph 7e describes what "Non-Critical" businesses must do to operate under the EO:

   i.  Develop a COVID-19 Preparedness Plan;

   ii.  Customer-facing businesses, such as stores in malls, must include provisions according to DEED/Stay Safe Minnesota guidance for customer safety;

i.  Institutions of higher education may offer in-person classes consisting of no more than 25 people.

111.  Under Paragraph 8 of the EO, outdoor recreational facilities may operate so long as they adhere to DEED/Stay Safe Minnesota guidance.

112.  The DEED guidance for retail businesses, where people are gathered

indoors, requires no more than 50% of occupancy allowed in the business' indoor physical location at any time, https://mn.gov/deed/assets/reopening-minnesotas-consumer-facing-businesses_tcm1045-431883.pdf, p. 6 (last visited June 16, 2020).

113.   EO 20-74 threatens a penalty for violation by individuals of up to 90 days in jail and up to a $1,000 fine for individuals under Minn. Stat. § 12.45.

114.   EO 20-74 also threatens a penalty for violation of up to a year of imprisonment and a $3,000 fine for business owners without citing to any statutory authority for that higher penalty.

115.   EO 20-74 also threatens that the Attorney General may seek civil relief under Minn. Stat. § 8.31 of up to $25,000 per occurrence for businesses violating EO 20-74.

116.   The Attorney General has taken action against businesses who threaten to violate the EOs. https://www.ag.state.mn.us/Office/Communications/2020/05/17_Shadys.asp (last visited June 16, 2020).

***Other Threatened Actions***

117.   At a May 20, 2020 conference, Governor Walz was asked why restaurants would be allowed to open for outdoor seating of 50 but churches could not have outdoor seating of more than 10. He responded, in part, something to the effect of, 'I will confess on this one. . we struggle on this one', and "I will acknowledge, the logic of that argument is sound."

**The Executive Orders Shut Down Plaintiffs' Businesses and Leave Others Open**

118.   Each of the Plaintiff businesses and their owners has suffered severe

damages as a result of Governor Walz' orders, which allow others to operate despite the threat posed by their operation in the midst of COVID-19.

***Northland Baptist Church and Pastor John Bruski***

119.    Northland Baptist Church ("Northland") is a church in St. Paul, Minnesota. Its Pastor is John Bruski, who also lives in St. Paul.

120.    Northland usually holds a Sunday School service, two Sunday services in the morning and evening, and a Wednesday evening service. Northland is a small church that usually hosts 10-20 attendees at each service.

121.    Northland was prohibited from holding from any in-person services or other religious gathering by EOs 20-20, 20-33, and 20-48, and prohibited from holding any in-person gatherings of more than 10 people by EO 20-56. Governor Walz made clear that EO 20-20, for example, banned church meetings. https://www.fox9.com/news/minnesota-governor-stresses-no-large-gatherings-as-easter-passover-approach.

122.    While these EOs made an exception for worship leaders and to facilitate online services, Northland does not broadcast its services live. It posts to YouTube and Anchor FM after the recorded services end. Recorded services are not a replacement for in-person services, as the Bible states that Christians should not "forsak[e] the assembling of ourselves together," Hebrews 10:25 (KJV), and Northland is a Bible-believing church whose statement of faith declares that "The Holy Scriptures of the Old and New Testaments are THE Plenary Inspired Word of God."

123.    Thus, the shutdown EOs 20-20, 20-33, and 20-48 banned Northland from

holding church services, and EO 20-56 prohibited Northland from holding any in-person gatherings of more than 10 people. The EOs did not provide for the opportunity to hold church services while sanitizing the church and common areas and observing social distancing.

124. At the same time, the EOs allowed big box stores and other places, like even bait shops, to operate.

125. The EOs did not allow churches to hold services outside, either, despite allowing outdoor recreation like running, where people often come into close proximity to one another on heavily used trails.

126. EO 20-62 finally allowed Northland to operate at 25% capacity. However, Northland was still not allowed to operate in the same manner as "commercial activity by workers and customers of Critical and Non-Critical Businesses," which could operate at 50% capacity at minimum, and some at full capacity.

127. EO 20-74 allows Northland to operate at 50% capacity. However, Northland is still not allowed to operate in the same manner as "Critical" businesses, which can operate at full capacity so long as they follow DEED guidelines.

128. Northland wishes to hold church services consistent with proper sanitization procedures and social distancing at the same capacity as "Critical" businesses," but fears prosecution under the EOs by Attorney General Keith Ellison.

***Living Word Christian Center***

129. Living Word Christian Center ("LWCC") is a church with campuses in Brooklyn Park, St. Paul, and Rogers, Minnesota.

28

130.    LWCC usually holds Saturday, Sunday, and Wednesday services. LWCC is a large church that hosts anywhere from 150 to 1,600 attendees, depending on the service date and time.

131.    LWCC was prohibited from holding from any in-person services or other religious gathering by EOs 20-20, 20-33, and 20-48, and prohibited from holding any in-person gatherings of more than 10 people by EO 20-56. Governor Walz made clear that EO 20-20, for example, banned church meetings. https://www.fox9.com/news/minnesota-governor-stresses-no-large-gatherings-as-easter-passover-approach.

132.    While LWCC has been able to broadcast services online, it has come at a steep cost in terms of investment of human capital and unbudgeted monies. LWCC believes that broadcast services are not a replacement for in-person services, as the Bible states that Christians should not "forsak[e] the assembling of ourselves together," Hebrews 10:25 (KJV), and LWCC is a Bible-believing church which believes that this scriptural mandate is as relevant today as it was in the First Century A.D.

133.    Thus, the shutdown EOs banned LWCC from holding in-person church services, and EO 20-56 prohibited LWCC from holding any in-person gatherings of more than 10 people. The EOs did not provide for the opportunity to hold church services while sanitizing the church and common areas and observing social distancing. LWCC has held services per its regular times and provided supplemental content during the week, all on digital platforms.  The church abided by the shutdown order and provided weekly food distributions, childcare for essential workers, and significant benevolence to impacted people.

134.   At the same time, the EOs allowed big box stores and other places, like liquor stores and even bait shops, to operate.

135.   The EOs did not allow churches to hold services outside, either, despite allowing outdoor recreation like running, where people often come into close proximity to one another on heavily used trails.

136.   None of the updated shutdown EOs eased the burdens on LWCC, either, and they presented a financial hardship on the church coupled with a significant spike in benevolence, pastoral care, and food requests that LWCC has strived to meet.

137.   EO 20-62 finally allowed LWCC to operate at 25% capacity or up to 250 people in a self-contained space. However, LWCC was still not allowed to operate in the same manner as "commercial activity by workers and customers of Critical and Non-Critical Businesses," which could operate at 50% capacity at minimum, and some at full capacity. The Mall of America was arbitrarily treated differently than LWCC.

138.   EO 20-74 allows LWCC to operate at 50% capacity or up to 250 people in a self-contained space. However, LWCC was still not allowed to operate in the same manner as "Critical" businesses, which can operate at full capacity so long as they follow DEED guidelines.

139.   LWCC wishes to hold church services consistent with proper sanitization procedures and social distancing at the same capacity as Critical businesses, but fears prosecution under the EOs by Attorney General Keith Ellison.

***Myron's Cards and Gifts, Inc. and Larry Evenson***

140.   Plaintiff Myron's Cards and Gifts, Inc. ("Myron's") does business as

30

Evenson's Hallmark and features five retail locations in Bloomington, Coon Rapids, Roseville, Blaine, and Mankato, Minnesota. Myron's is owned and operated by Larry Evenson.

141.    Myron's has employed approximately 45 full and part-time employees and has been in business for decades (51 years).

142.    Myron's mall location in Roseville was shut down by EO 20-04 on March 19, 2020 because of the substantial reduction in mall customer traffic, and EO 20-20 shut down the remaining four stores to in-store face-to-face customer transactions on March 27, 2020.

143.    Because of the EOs, Myron's has experienced hundreds of thousands of dollars of damages, and approximately $350,000 as of the beginning of May 2020. Its full and part-time employees (with the exception of one full-time employee) were laid off because they were not been able to work under the EOs.

144.    Because of the EOs, Myron's was unable to meet vendor inventory debt obligations and rent obligations.

145.    Because of the EOs, customers have been driven to big box competitor stores like Target, Walmart, Walgreens, or CVS, which are deemed "Critical" and where patrons can get Hallmark cards and the like.

146.    Even though these big name stores are deemed "Critical," and Myron's is not, Myron's can easily operate by observing sanitization procedures and maintaining social distancing, in a way far better and more in keeping with federal guidelines than can occur at Target or CVS, which have experienced large crowds in Minnesota during the

COVID-19 pandemic.

147.   Because of the EOs, Myron's missed three of the most important revenue generating seasons in the card and gift industry: Easter, Mother's Day, and Graduation.

148.   Even though EO 20-48 allowed for some curbside pick-up, the amount of revenue generated from that change was miniscule and only paid the wage of one employee in three stores as of May 4, 2020.

149.   Myron's owner, Larry Evenson, was unable to work because of the shutdown imposed by EOs 20-20, 20-33, and 20-48.

150.   EO 20-56 only allowed Myron's to operate in a limited capacity, with up to 50% of capacity, and to implement a COVID-19 Preparedness Plan.

151.   EO 20-63 continued the 50% capacity regime of EO 20-56.

152.   EO 20-74 continued the 50% capacity regime of EO 20-63.

153.   Myron's wants to fully operate its stores consistent with proper sanitization procedures and social distancing guidelines where possible. However, they fear that if they fully open their business, they could be prosecuted by Attorney General Keith Ellison.

*Glow In One Mini Golf L.L.C. and Aaron Kessler*

154.   Plaintiff Glow In One Mini Golf L.L.C. ("Glow In One") is an indoor blacklight mini-golf experience located in Blaine, Minnesota and owned and operated by Plaintiff Aaron Kessler.

155.   Glow In One has employed approximately 4 part time employees.

156.   Glow In One was totally shut down by EO 20-04 on March 17, 2020 at

5:00 PM. EOs 20-20, 20-33, 20-48, 20-56, and 20-63 made it impossible for Glow In One to operate as well.

157.  Because of the EOs, Glow In One had experienced damages of approximately $40,000 to 45,000 as of early May 2020. Because March is a huge business month for an indoor facility like Glow In One, the damage has been enormous. Its full time employees were laid off because they were not able to work under the EOs.

158.  Glow In One had to refund party reservation deposits and other deposits made through the summer months as patrons cancelled those events due to uncertainty caused by the EOs.

159.  Despite being shut down, Glow In One still has to pay its rent, overhead, and loan expenses, but cannot afford to pay rent and has been denied rent relief. Glow In One fears an eviction as soon as Governor Walz' moratorium on evictions ends and expects damages will top $100,000 from its inability to operate under the above EOs.

160.  Like with outdoor golf courses, Glow In One has the ability to service customers while sanitizing equipment, preventing touching of common surfaces like the cups on a given hole, and maintaining social distance between all patrons not in the same household. Nonetheless, Glow In One was totally prohibited from operating while golf courses were allowed to operate by virtue of EO 20-38 and 20-63.

161.  Glow In One's owner and operator, Aaron Kessler, was also unable to work because of the shutdown imposed by EO 20-04. As a result, Mr. Kessler and his family's finances will likely be devastated by the loss of business and corresponding personal liability for rent obligations that Glow In One is now unable to pay.

162. Glow In One was still prohibited from operating by EO 20-63.

163. Glow In One is finally now able to reopen partially under EO 20-74, with up to 25% of capacity in its facility.

164. Glow In One wants to fully operate consistent with proper sanitization procedures and social distancing like Critical businesses. However, it fears that, because of the punishments threatened by the EOs, if it fully reopens, it could be prosecuted by Attorney General Keith Ellison.

### *The A J Hulse Company, Andrew Hulse, and Gay Bunch-Hulse*

165. Plaintiff The A J Hulse Company ("AJ Hulse") does business as 18 | 8 Fine Men's Salons and features two retail locations in Maple Grove and Wayzata. AJ Hulse is owned and operated by Andrew Hulse and Gay Bunch-Hulse.

166. AJ Hulse has employed approximately 20 full time equivalent employees and has been growing because of its excellent service and professionalism.

167. AJ Hulse was shut down by EOs 20-04 and 20-08 on March 17, 2020 at 5:00 PM. EOs 20-20, 20-33, and 20-48 made it impossible for AJ Hulse to operate as well. All employees were laid off.

168. Because of the EOs, AJ Hulse was experiencing damages of approximately $80,000-90,000 per month in early May 2020, and continues to experience damages because of the restrictions imposed by EO 20-63 and EO 20-74. Its full time employees were laid off because of the shutdown EOs.

169. AJ Hulse had submitted plans to the state requesting the ability to re-open during the shutdown period, but was not authorized to reopen, even partially, prior to

June 1.

170.    Despite being shut down, AJ Hulse still had to pay its rent (even while obtaining some deferrals) and loan expenses.

171.    Perhaps most frustrating for AJ Hulse, its employees are licensed by the state and specifically trained in infection control as part of the state licensing regime, and, because of this training, AJ Hulse employees could have easily adapted to additional procedures to minimize the risk of spreading COVID-19. In fact, Andrew and Gay tapped into industry resources to establish best practices early on in the COVD-19 pandemic.

172.    Nonetheless, AJ Hulse was completely shut down without any economic use of its business from March 17 through June 1. EO 20-48 allowed the sale of retail products, but AJ Hulse's business' viability depends on its ability to provide professional services such as men's haircuts. Retail products represent only about 2.5% of sales for AJ Hulse.

173.    At the same time, EO 20-48 allowed pet groomers to give animals haircuts, but AJ Hulse was not allowed to operate.

174.    AJ Hulse's owners, Andrew Hulse, and Gay Bunch-Hulse, were also unable to work because of the shutdown imposed by EOs 20-04 and 20-08.

175.    Andrew Hulse was not eligible for unemployment benefits. Gay Bunch-Hulse was provided some unemployment benefits after a long wait.

176.    EO 20-63 allowed AJ Hulse to operate only at 25% capacity, which means AJ Hulse continued to experience damages because of the Governor's EOs.

177.    EO 20-74 allows AJ Hulse to operate only at 50% capacity, which means

AJ Hulse continues to experience damages because of the Governor's EOs.

178.   AJ Hulse wants to fully operate consistent with proper sanitization procedures and social distancing where possible at the same capacity as Critical businesses. However, it fears that, because of the punishments threatened by the EOs, if the business fully reopens, it could be prosecuted by Attorney General Keith Ellison. In fact, on May 4, 2020, a St. Paul barbershop that publicly attempted to re-open during the shutdown was closed down by police. AJ Hulse also fears losing its license and thus its ability to operate, which has been communicated by both the Cosmetology Board and the Barber Board in Minnesota.

### The EOs Exceed the Governor's Statutory Authority

***Section 12.21, subd. 3(7).***

179.   Minnesota Statutes Chapter 12 was passed in 1951, just after World War II and as the threat of nuclear attacks by the Soviet Union began to pose a threat to American security.

180.   Section 12.01 in its original form (attached as Exhibit M) states that the Act's purpose, in relevant part, is as follows: "Because of the existing and increasing possibility of the occurrance [sic] of disasters of unprecedented size and destructiveness resulting from enemy attack, sabotage, or other hostile action, and in order to insure that preparations of this state will be adequate to deal with such disasters, and generally to provide for the common defense and protect the public peace, health, and safety, and to preserve the lives and property of the people of the state, it is hereby found and declared to be necessary: . . . (3) To provide for the rendering of mutual aid among the political

subdivisions of the state and with other states, and to cooperate with the federal government with respect to the carrying out of civil defense functions.

181.   Section 201, subdivision 3(9) of the 1951 Act provided that the governor had to power to effect "the evacuation and reception of the civilian population," which powers could be used, consistent with the act's purpose, to "cooperate with the federal government, with other states, and with private agencies, in all matters pertaining to the civil defense of this state and of the nation."

182.   The Minnesota Emergency Management Act of 1996 (attached as Exhibit N) amended the 1951 Act and changed some of the language of the act, adding natural disasters to the language and removing "civil defense" and references to the "common defense" and changing them to refer to "emergency management," consistent with the change in the federal agency responsible for emergency management from the Federal Civil Defense Administration to the Federal Emergency Management Administration in 1979.

183.   With respect to section 12.21, subdivision 3, the numbering of that subdivision changed so that the provision applicable to "evacuation and reception of the civilian population" became "the evacuation, reception, and sheltering of persons," close to what it is today.

184.   Section 12.21 specifically refers to powers to "cooperate with" with the federal government, agencies, or other states as an antecedent for any sheltering requirement. There is no standalone power in section 12.21 allowing the governor to shelter persons except for the purpose of cooperation with another government.

185.    The Minnesota Court of Appeals held, while granting a writ of quo warranto in a published decision in 2019, that where a Minnesota statute requires an agency's "cooperation with" another entity to exercise a power, it may not exercise that power alone. *Save Lake Calhoun v. Strommen*, 928 N.W.2d 377, 388 (Minn. Ct. App. 2019). The Supreme Court later upheld the writ of quo warranto while reversing the judgment of the Court of Appeals.

186.    No federal or neighboring state demand has been made on Minnesota to "cooperate with" another governing body or agency to shelter persons in place within Minnesota's territorial jurisdiction.

187.    Minn. Stat. § 12.21 subd. 3(7) thus did not authorize EOs 20-20, 20-33, or 20-48, or any other shelter in place order issued by Governor Walz.

188.    Governor Walz' EOs 20-20, 20-33, and 20-48 required sheltering in place without the statutory authority to do so.

***Section 12.31, subd. 2***

189.    Section 12.31, subdivision 2 only allows declaration of a peacetime emergency if "an act of nature . . . endangers life ***and*** property ***and*** local government resources are inadequate to handle the situation." (Emphasis added).

190.    The statute does not state that the governor has the authority to predict that local government resources ***might*** become inadequate to handle the situation; the statute requires that local government resources ***are*** inadequate.

191.    While EO 20-01 asserts that local government resources are inadequate to handle the situation, EO 20-01 provides no evidentiary support or rational basis for that

claim. None of the subsequent EOs provides a basis for that claim.

192.   While EO 20-01 states that life and property are threatened by COVID-19, there is no evidence that property is threatened by the virus.

193.   At the time EO 20-01 was ordered, Minnesota only had 14 confirmed cases of COVID-19, and there was no actual evidence that local government resources were inadequate to address the hospital capacity issues supposed to be correlated to the spread of COVID-19.

194.   As of May 4, 2020, major health care companies and hospitals were in the midst of massive layoffs and furloughs of hospital staff because hospitals are relatively empty following Governor Walz' ban on non-elective surgeries. https://www.startribune.com/minneapolis-based-allina-health-extends-workforce-reductions-in-wake-of-covid-19-pandemic/570190722/.

195.   The Minnesota Department of Health has guidance for addressing possible pandemics and responses to them, and categorizes the level of need based on the status of the disease at issue, its spread, and its effect on health care facilities. https://www.health.state.mn.us/communities/ep/surge/crisis/panstages.html.

196.   Governor Walz did not reference the MDH's Pandemic Incident Command Considerations to indicate that there was an "overwhelming number of local cases beyond capacity of healthcare system," as categorized by the MDH's guidance.

197.   There is no evidence that local government resources are inadequate to handle the COVID-19 situation.

198.   Governor Walz' EO 20-01 thus exceeds his statutory authority to declare an

emergency, and Plaintiffs thus request that the Court issue a writ of quo warranto to restrain the governor's ongoing *ultra vires* conduct.

### Sections 12.45 and 8.31

199.  Section 12.45 authorizes penalties and jail time against individuals of up to a $1,000 fine and 90 days in jail.

200.  Section 12.45 does not reference businesses as subject to criminal penalties.

201.  Section 12.45 does not reference Section 8.31.

202.  Section 8.31 allows the attorney general to seek civil penalties of up to $25,000 for violation of various consumer fraud statutes and the like. It does not mention chapter 12.

203.  Section 8.31 only provides limited powers to the attorney general. It does not allow county or city attorneys to exercise its civil penalty authority.

204.  EOs 20-40 and 20-48 threaten individuals with penalties under Section 12.45, but also threaten businesses with up to a $3,000 fine and a year in jail for encouraging or requiring employees to violate the Orders. These EOs do not cite any statutory authority to support these punishments.

205.  EOs 20-40 and 20-48 also threaten that the AG can seek up to $25,000 in civil damages under Minn. Stat 8.31. However, the AG is not specifically authorized to enforce the governor's executive orders under § 8.31. There are no cases in Minnesota citing Minn. Stat 8.31 that mention the phrase "executive order."

206.  No other statute passed by the Legislature allows Governor Walz to assess any penalty than the penalty for individuals identified in Minn. Stat. § 12.45.

207.    Governor Walz did not have the authority to issue executive orders threatening penalties to businesses.

208.    Governor Walz did not have the authority to issue executive orders authorizing the Attorney General and county and city attorneys to penalize or prosecute businesses or persons under Section 8.31.

209.    Governor Walz' threats of penalties under EOs 20-40 and 20-48 thus exceed his statutory authority, and Plaintiffs request that the Court issue a writ of quo warranto to restrain the governor's ongoing ultra vires conduct. Because the purported authority granted by EOs 20-40 and 20-48 exceeds the authority allowed to be exercised by the Attorney General and the County Attorney Defendants, Plaintiffs request that these defendants also be prohibited from acting upon that purported authority.

210.    The ultra vires conduct of the Defendants described here also demonstrates the lack of rational basis for the deprivations of Plaintiffs' constitutional rights described herein.

*Section 12.32*

211.    Section 12.32 purports to give the Governor's EOs the "full force and effect of law." EO 20-74 repeats this statement.

212.    The Minnesota Legislature "cannot delegate purely legislative power to any other body, person, board, or commission." *Lee v. Delmont*, 36 N.W.2d 530, 538 (Minn. 1949). This is Minnesota's non-delegation doctrine.

213.    Through the EOs, the Governor attempts to exercise purely legislative power that only the Legislature can exercise. The EOs are therefore void because they

violate Minnesota's non-delegation doctrine.

## Article III Standing

214.   The Plaintiffs have Article III standing to bring their claims because they have suffered money damages and would choose to work or freely exercise their religion and rights to speech and assembly, but they cannot because of a credible threat of prosecution by the Attorney General and applicable County Attorneys based on the penalties threatened by the EOs.

## CAUSES OF ACTION

215.   Plaintiffs have set forth a short and plain statement showing their entitlement to relief that is substantially plausible under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662, and *Johnson v. City of Shelby*, 135 S. Ct. 346 (2014), and further identifies discrete claims for relief, which include but are not limited to the following.

216.   Defendants do not have any type of immunity from suit because any Minnesota statute they might rely upon to justify their conduct is unconstitutional, facially or as-applied, as set forth herein.

217.   Governor Walz' positions taken related to the EOs are not substantially justified, and no special circumstances would make an award of attorney fees to Plaintiffs unjust. Minn. Stat. § 15.472.

**Count One**
**Free Exercise of Religion**
**U.S. Const. Amend. I and Minn. Const. Art. I, § 16.**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201**

218.    Plaintiffs incorporate the preceding paragraphs by reference.

219.    Plaintiffs Northland Baptist Church and Living Word Christian Center's sincerely held religious beliefs teach that the Bible is the inspired Word of God and the sole authority for faith and practice.

220.    Plaintiffs Northland, Bruski, and LWCC sincerely believe that the Bible teaches the necessity of gathering together for corporate prayer and worship and that such assembly is necessary and good for the Church and its members' spiritual growth.

221.    EO 20-74 substantially burdens Northland, Bruski, and LWCC's religion by prohibiting them from holding in-person church services with more than 50% of building capacity or more than 250 congregants.

222.    EO 20-74 substantially interferes with Northland, Bruski, and LWCC's ability to carry out their religious doctrine, faith, and mission.

223.    EO 20-74is neither neutral nor generally applicable.

224.    The State does not have a compelling reason for limiting church services where congregants can otherwise practice adequate social distancing protocol to 50% of building capacity of up to 250 congregants in any single self-contained space, especially when compared to the vast secular activities for "critical" businesses exempted under the EOs, nor has it selected the least restrictive means to further any purported interest.

225.    EO 20-74 violates the Free Exercise Clause of the First Amendment to the

United States Constitution and Article I, section 16 of the Minnesota Constitution, both facially and as applied.

226.   EO 20-74 is arbitrary, capricious, and unconstitutional because it is based on the EOs, including EO 20-01 and its amending orders, which lack any statutory authority under Minnesota law and are thus void.

227.   In the absence of declaratory and injunctive relief, Northland, Bruski, and LWCC will be irreparably harmed.

**Count Two**
**Free Speech and Peaceable Assembly**
**U.S. Const. Amend. I and Minn. Const. Art. I, § 3**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201**

228.   Plaintiffs incorporate the preceding paragraphs by reference.

229.   EO 20-74 violates Plaintiffs Northland, Bruski, and LWCC's right to peaceably assemble because the ban on in-person services of more than 50% of building occupancy and limited to 250 congregants in a self-contained space does not serve any legitimate, rational, substantial, or compelling government interest when compared to secular activity that is not restricted..

230.   Prohibiting or punishing Plaintiffs Northland, Bruski, and LWCC's religious speech and assembly does not serve any legitimate, rational, substantial, or compelling government interest when compared to secular activity that is not restricted.

231.   Defendants also have alternative, less restrictive means to achieve any interests that they might have.

232.   EO 20-74 is arbitrary, capricious, and unconstitutional because it is based

on EO 20-01, which lacks any statutory authority under Minnesota law and is thus void.

233.    EO 20-74 violates the Free Speech and Assembly Clauses of the First Amendment to the United States Constitution, both facially and as applied.

**Count Three**
**Equal Protection**
**U.S. Const. Amend. XIV**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201**

234.    Plaintiffs incorporate the preceding paragraphs by reference.

235.    The regime of EOs described above in this Complaint show that Governor Walz—and the Attorney General authorized to enforce the EOs—have deprived all Plaintiffs of the equal protection of the laws guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 because they ban or substantially restrict Plaintiffs' work and speech but except other similarly situated persons and businesses from their restrictions.

236.    Thus, as described above, the EOs restrict religious speech but allow union leaders to operate, restrict the sale of Hallmark cards at a local store but allow Target, Walmart, Walgreens, and CVS to sell them without restriction, allow outdoor golf because social distancing is possible but restrict indoor golf where social distancing is possible, and restrict people from getting haircuts while allowing pets to get haircuts and others to cluster in hardware and liquor stores in the same retail locations, and even the Mall of America.

237.    When the government treats individuals or businesses disparately as compared to similarly situated persons, and that disparate treatment burdens a

fundamental right or has no rational basis, no substantial relationship to the objectives of the order, or is arbitrary and capricious, that treatment violates the Equal Protection Clause of the United States Constitution and 42 U.S.C. § 1983.

238.   As set forth in this Complaint, EO 20-74 treats the Plaintiffs and their businesses differently than other businesses despite the categorization being underinclusive and having no rational relationship to the object of the Orders, prevention of the spread of COVID-19.

239.   In the absence of declaratory and injunctive relief, Plaintiffs will be irreparably harmed.

240.   EO 20-74 is arbitrary, capricious, and unconstitutional because it is based on EO 20-01 and its amending orders, which lack any statutory authority under Minnesota law and are thus void.

241.   Because of Defendants' actions, Plaintiffs have suffered direct and immediate violations of their fundamental rights guaranteed by the United States Constitution and are therefore entitled to money damages, injunctive relief, and declaratory relief to redress, remedy, and prevent future violations of their rights.

**Count Four**
**U.S. Const. Amend. V**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201**

242.   Plaintiffs incorporate the preceding paragraphs by reference.

243.   By virtue of the EOs, Governor Walz has seized or commandeered without just compensation the business Plaintiffs' property in the form of their access to their physical property, total or substantial lost revenue, and goodwill.

244.    These uncompensated takings violate the Takings Clause of the Fifth Amendment to the United States Constitution.

245.    Governor Walz has taken or commandeered personal property and facilities for emergency management purposes, and has failed to promptly pay just compensation for the property's use.

246.    With respect to the Fifth Amendment to the United States Constitution, temporary takings are compensable if they deprive a plaintiff of all economic use of property, which is what has happened to the Plaintiff businesses.

247.    The business Plaintiffs are entitled to just compensation in an amount to be determined at trial, and their damages continue to accrue.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant them relief as follows after a trial by jury, which is demanded:

A.    An award of money damages under 42 U.S.C. § 1983 for Defendant Governor Walz' unconstitutional deprivations and takings;

B.    A declaration that Governor Walz did not have the statutory authority to declare an emergency that invoked Chapter 12 of the Minnesota Statutes, issue shelter in place orders, authorize penalties in excess of his statutory authority, or otherwise restrict lawful activity under Chapter 12 under the circumstances, and that the Attorney General does not have the authority to prosecute violations of the EOs using that authority;

C.    A declaration that Defendants violated the equal protection rights of the Plaintiffs under the United States and Minnesota Constitutions to free exercise, free

speech, peaceable assembly, and the right to operate their businesses without arbitrary and capricious government interference;

D.     An injunction prohibiting the Defendants from enforcing EO 20-74, and any additional, successor, or replacement executive orders which violate Plaintiffs' rights;

E.     An award of attorney fees in favor of Plaintiffs and against Defendants upon Plaintiffs prevailing in this litigation, pursuant to 42 U.S.C. § 1988 and Minn. Stat. § 15.472; and

F.     An award of all other relief that the court may deem just, proper, or equitable.

Respectfully submitted,

Dated:  June 22, 2020                        /s/ Douglas P. Seaton
                                             **UPPER MIDWEST LAW CENTER**
                                             Douglas P. Seaton (#127759)
                                             8421 Wayzata Blvd., Suite 105
                                             Golden Valley, Minnesota 55426
                                             doug.seaton@umwlc.org
                                             (612) 428-7000

                                             *Attorneys for Plaintiffs*