**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Northland Baptist Church of St. Paul, Minnesota, et al., | Court File No. 20-CV-1100 (WMW/BRT) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Governor Tim Walz, individually and in his official capacity, et al., | |
| Defendants. | |

## <u>INTRODUCTION</u>

The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances.

*Ex parte Milligan*, 71 U.S. 2, 120-21 (1866).

Plaintiffs brought this lawsuit because, in the midst of a pandemic, Governor Tim Walz openly forced Plaintiffs to bear the brunt of the pandemic's economic and social costs while other like businesses were allowed to fully operate. That is the essence of an equal protection violation. Defendants ask the Court to view this case from the perspective that Plaintiffs must simply share in the burden that everyone has to carry to fight through this tough time—but the Defendants' favored businesses and entities haven't shared in that burden. Plaintiffs simply want to be treated the same as the so-called "Critical" businesses in Minnesota. Defendants have refused to treat them accordingly.

Additionally, while Defendants argue on paper that the governor's illegal orders are essential to save lives, they totally ignored the governor's fiats when others' First

1

Amendment rights came into competition with them. In late May and early June 2020, the Governor and Attorney General entirely abandoned Emergency Executive Order ("EO") enforcement and even participated in social gatherings that directly violated EOs when large numbers of Minnesotans took to the streets to protest against police misconduct related to the tragic death of George Floyd on May 25, 2020, and when many gathered together to remember Mr. Floyd at his memorial service in Minneapolis. It is entirely foreign to the Constitution for state officials to treat the First Amendment rights of some as more important than those of others based on the content of the rights exercised.

Moreover, contrary to the Defendants' claims, "public record" sources do not lend credibility to the notion that the EOs were "thoughtfully conceived" or have any "real or substantial relation to the protection of public health." (Defs.' Mem. in Supp. of Mot. to Dismiss 1-2, 17, ECF 56) ("Defs.' Mem."). Rather, the objective data available to Defendants and this Court showed and continue to show the opposite. Governor Walz unlawfully seized his emergency powers when Minnesota had a total of 14 COVID-19 cases. The "Minnesota Model" developed in late March—on which Governor Walz based his discriminatory shutdowns—predicted that 74,000 Minnesotans would die in this pandemic. The Defendants' numbers were and are wrong by several orders of magnitude. In addition, neighboring states that did not lock down are doing better than Minnesota in this pandemic, even controlled for population.

The shutdown was a costly failure, but, more importantly, the shutdown ***did not have to discriminate*** between Plaintiffs and so-called "Critical" businesses exempted by Governor Walz. Defendants do not seem to recognize this key problem with the Governor's

orders. Whether the EOs pass constitutional scrutiny cannot be analyzed from the perspective of whether the EOs themselves have a relationship to public health. The question is whether the ***distinction drawn*** by the Governor between similarly situated entities was justified under the Constitution's First Amendment and Equal Protection Clause.

Defendants fail to support their distinctions. Instead, they falsely claim that "Plaintiffs want to operate at full capacity in the midst of this pandemic, and without following guidance designed to keep Minnesotans safe." (Defs.' Mem. 3). This is the opposite of Plaintiffs' requests. (*E.g.,* Second Am. Compl. ("SAC") ¶3 ("There was and is ***no reason*** that someone should be able to go to the Mall of America but not Living Word Christian Center with the **<u>same rules</u>** in place.") (latter emphasis added)). The Court should deny Defendants' motion to dismiss and allow this case to proceed to summary judgment.

## <u>RELEVANT FACTS</u>

### I.   <u>There Is No Authority Under Minnesota Law for a Public Health Emergency.</u>

In 2005, H.F. No. 1555 was signed into law and modified Minn. Stat. § 12.31. That bill read as follows, in relevant part:

> Subd. 2.  [DECLARATION OF PEACETIME EMERGENCY.]
> (a) The governor may declare a peacetime emergency.  A peacetime declaration of emergency may be declared only when an act of nature, a technological failure or malfunction, a terrorist incident, ~~a public health emergency,~~ an industrial accident, a hazardous materials accident, or a civil disturbance endangers life and property and local government resources are inadequate to handle the situation.

(Decl. of James Dickey, Ex. 1). Thus, in 2005, the Minnesota Legislature and the Governor eliminated the Governor's authority to issue an emergency declaration based on a "public health emergency." Governor Walz refers to COVID-19 as a "public health risk." EO 20-74, p. 2. EO 20-74 claims that its restrictions are designed to "protect public health." (*Id.* ¶6). EO 20-74 refers to COVID-19 as a "public health crisis." (*Id.* ¶10). Defendants' attorneys call COVID-19 a "public-health crisis." (*Id.* ¶10; Defs.' Mem. 1). The Governor has no authority to declare a public health emergency under Minn. Stat. § 12.31, so each of his EOs is void and an abuse of power.

## II.   Defendants Totally Shut Down Plaintiffs' Businesses and Churches Under the Shutdown Orders.

Although he lacked authority to do so, Governor Walz selectively shut down the Minnesota economy beginning on March 17, 2020. The now-rescinded shutdown orders, EOs 20-04, 20-08, 20-18, 20-20, 20-33, 20-38, 20-48, and 20-56, effected a "taking" by eliminating all beneficial use or enjoyment of Plaintiffs' businesses and property via regulation, and disparately impacted Plaintiffs while exempting other favored businesses. While these EOs are no longer in effect, the injuries they caused Plaintiffs endure. In the most extreme example of incontestable injury to Plaintiffs, Defendants' shutdown forced Plaintiff Glow In One Mini Golf to close permanently. (Decl. of Aaron Kessler ¶8).

On March 16, 2020, Governor Walz issued EO 20-04. EO 20-04 closed a number of lawful Minnesota businesses, including amusement parks like Glow In One Mini Golf, as of 5:00 PM on March 17, 2020. (SAC ¶¶34-35). Glow In One totally shut down at that time. (SAC ¶156; Kessler Decl. ¶3).

4

On March 18, 2020, Governor Walz issued EO 20-08, which shut down salons like The A J Hulse Company. EO 20-08 was dated March 18 and effective immediately, with no lead time to prepare for the forced closure. (SAC ¶¶45, 167; Decl. of Andrew Hulse ¶3).

On March 25, 2020, Governor Walz issued EO 20-20, which forced Minnesotans to stay home and not work, shop, or attend church beginning March 27, 2020 unless involved in "Critical Sectors." (SAC ¶¶48-58). While Defendants claim these distinctions stemmed from CISA guidance, that guidance actually emphasized the importance of keeping businesses *open*, not shut. (ECF 1, Ex. L). And, nowhere does the CISA guidance indicate that labor union leaders, those providing reproductive health services, medical cannabis workers, RV and ATV salespeople, and pet adoption coordinators, are "critical" or essential, yet EO 20-20 and its amending orders exempted them. (*Id.*).

From March 27, 2020 through May 3, 2020, EOs 20-20, 20-33, and 20-38 totally shut down Plaintiff Myron's Cards and Gifts' business and continued to shut down AJ Hulse and Glow In One's business. (Decl. of Larry Evenson, ¶5; Kessler Decl. ¶6; Hulse Decl. ¶6).

On May 4, 2020, EO 20-48 became effective and allowed a miniscule amount of business via curbside pickup. AJ Hulse's curbside sale of hair products accounts for only about 2.5% of its sales revenue, and thus it remained closed. (SAC ¶172; Hulse Decl. ¶7). Glow In One continued to be shut down entirely. (Kessler Decl. ¶6). Myron's curbside business only accounted for 5% of projected revenue. (Evenson Decl. ¶7).

On May 18, 2020, EO 20-56 allowed Myron's Cards and Gifts to reopen up to 50% capacity, with restrictions. (Evenson Decl. ¶10). AJ Hulse and Glow In One remained

closed. (Kessler Decl. ¶6; Hulse Decl. ¶8). On June 1, 2020, AJ Hulse was allowed to open to 25% capacity under EO 20-63. (SAC ¶105). Glow In One remained shut down.

On June 10, 2020, EO 20-74 finally allowed Glow In One to operate at 50% capacity; but it was too late. Glow In One never reopened because of the losses the prior EOs caused it. (Kessler Decl. ¶8). EO 20-74 allowed AJ Hulse to open to 50% capacity. Myron's continues to be open at 50% capacity. (Evenson Decl.; Hulse Decl.).

Glow In One suffered total losses from March 17 through today. AJ Hulse suffered total losses from March 17 through June 1. Myron's suffered total losses from March 27 through May 3, and a near-total loss from May 4 through May 18. The following timeline summarizes these losses directly caused by Defendants' EOs:

| Plaintiff | 20-04 | 20-08 | 20-18 | 20-20 | 20-33 | 20-38 | 20-48 | 20-56 | 20-63 |
|---|---|---|---|---|---|---|---|---|---|
| Glow In One | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| AJ Hulse | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Myron's | 0% | 0% | 0% | 100% | 100% | 100% | 95% | | |

(Kessler Decl.; Hulse Decl.; Evenson Decl.) Glow In One's losses are about $200,000. (Kessler Decl. ¶7). Myron's revenue losses for the time period March 27 through May 17 were about $343,000. (Evenson Decl. ¶¶6, 9). AJ Hulse's estimated revenue losses from March 17 though June 1 were about $180,000. (Hulse Decl. ¶ 6).

Defendants argue that there hasn't been a categorical taking here, but the facts belie that assertion. Defendants' EOs caused Plaintiffs Glow In One, AJ Hulse, and Myron's total losses throughout the shutdown order regime.

### III.   Defendants Arbitrarily and Capriciously Treat Plaintiffs Differently Than Other Similar Entities Under EO 20-74.

On June 5, 2020, Governor Walz issued EO 20-74[1], which became effective on June 9, 2020. EO 20-74 remains in place, as amended by EO 20-81 related to mask-wearing. Paragraphs 6 and 7 of EO 20-74 describe restrictions applicable to Minnesotans and their businesses.

Under Paragraph 6c of EO 20-74, the following restrictions are in place:

 a. No outdoor in-person gathering of more than 25 people, and no indoor in-person gathering of more than 10 people not of the same household is allowed, except for "commercial activity by workers and customers of Critical and Non-Critical Businesses."

 b. Weddings, funerals, and worship services may meet with up to 250 people in a "single self-contained space" at 50% of the normal occupant capacity of the space. (Kramer Decl. Ex. 17 pp. 4-6).

Paragraph 7c.iii.A of EO 20-74 distinguishes between "Places of Public Accommodation" ("PPAs") and places that are not, including as follows:

For the purposes of this Executive Order, the following establishments and facilities are not Places of Public Accommodation: . . . Establishments and facilities that offer food and beverage not for on-premises consumption, including grocery stores, markets, convenience stores, pharmacies, drug stores, and food pantries, other than those portions of the Places of Public Accommodation otherwise subject to the requirements of this paragraph 7.c.

(Kramer Decl. Ex. 17 p. 6). Thus, establishments such as Wal-Mart, Target, CVS, and others—even though they are no different from Plaintiffs' establishments in terms of the ability to space people or disinfect surfaces—are favored 'not PPAs' and are thus open

---

[1] EO 20-74's key terms are alleged in the SAC at paragraphs 108-116. *See also* Kramer Decl. Ex. 17.

without capacity restriction. *Minnesota's Stay Safe Plan*, https://mn.gov/covid19/for-minnesotans/stay-safe-mn/stay-safe-plan.jsp (last visited July 30, 2020).

Paragraph 7 of EO 20-74 then imposes restrictions on PPAs. PPAs that had been closed to the public during the shutdown imposed by prior EOs included indoor sports facilities, entertainment facilities, and hair salons. The total shutdown was lifted as follows, in relevant part:

➢ Barber shops and salons can partially open if they do not exceed 50% of capacity, workers wear face coverings, and they adhere to the requirements of "Non-Critical Businesses" in paragraph 7e of the EO. (Kramer Decl. Ex. 17 p. 7 ¶7.c.v).

➢ Indoor Recreational Entertainment Venues can partially open if they do not exceed 25% of capacity, up to 250 people. (*See* Dickey Decl. Ex. 2 p. 12).

These PPAs must then follow 9 pages of detailed guidance and restrictions, along with the requirements of "Non-Critical Businesses" in paragraph 7e of the EO. (SAC ¶107).

## IV.   When Questioned About the Basis for Distinctions Under the EOs, the Governor Has Struggled to Answer.

Governor Walz has struggled in his attempts to justify the distinction between businesses like Plaintiffs and those deemed 'non-PPAs,' and between churches and businesses allowed to open in full. For example, in his May 13 press conference, the governor outlined three 'critical factors' that would determine what can safely resume and reopen: (i) how close are you to another person in a given setting or activity; (ii) how long are you in that close proximity to another person; and (iii) how predictable that setting is. (Dickey Decl. Ex. 3). To illustrate the implementation of these factors in his decision-making, Walz considered this example: "For example, you're walking past people in a hardware store wearing a mask, that's less risky and more predictable than sitting for a

meal in a crowded restaurant." *Id.*

These 'factors' and this statement show how arbitrarily Plaintiffs like Myron's and Glow In One have been treated—under the Governor's enumerated factors, there is no difference between Plaintiffs and the stores allowed to operate in full.

Governor Walz has also struggled to support the distinctions between commercial activity and worship throughout the EO regime. At his May 20, 2020 conference, Governor Walz was asked why restaurants would be allowed to open for outdoor seating of 50 but churches could not have outdoor seating of more than 10. He responded, in part, something to the effect of, 'I will confess on this one  . . we struggle on this one', and "I will acknowledge, the logic of that argument is sound." (SAC ¶117). It is not surprising that Governor Walz issued EO 20-62 amending the restrictions on places of worship after Plaintiffs sought to press the force of that logic with their motion for a temporary restraining order, and after Minnesota's Catholic and Lutheran-Missouri Synod churches threatened widespread civil disobedience against such arbitrary restrictions.

## V.   The Shutdowns Were Ineffective.

Defendants defend their rule-by-decree by claiming that the EOs were "thoughtfully conceived" and have a "real or substantial relations to the protection of public health." (Defs.' Mem. 1-2, 17). Rather, the objective data showed and continue to show the opposite.

At the beginning of this crisis, Governor Walz elected to use a so-called "Minnesota Model" for projection of COVID-19 deaths, and made policy accordingly. That "Minnesota Model" was developed by researchers over one weekend of March 20-22,

2020. (Dickey Decl. Ex. 4). One of those researchers, a 2019 graduate of the University of Minnesota, quit an unrelated job to work on the model that Governor Walz would use to determine the economic fate of millions of Minnesotans. She is quoted as saying, "I don't think a lot of researchers get to work on something over the weekend and have public figures talk about it and make decisions based on it three days later." That over-the-weekend model predicted ***74,000 deaths*** for Minnesotans through the pandemic, and Governor Walz took it to heart: "If we just let this thing run its course and did nothing, upwards of 74,000 Minnesotans could be killed by this." (Dickey Decl. Ex. 5). That model also predicted ***nearly 1,000 deaths a day*** in Minnesota in July 2020. (Dickey Decl. Ex. 6). At the same time, the models from the University of Washington's Institute for Health Metrics and Evaluation (IHME) predicted 656 deaths through August 4—much closer to reality. (Dickey Decl. Ex. 7). The Minnesota Model predicted 50 times as many deaths as actually occurred.

Unfortunately for Minnesotans, it appears that the draconian measures that Governor Walz chose, and which Attorney General Ellison has selectively prosecuted, were for naught. A simple comparison of Minnesota's cases and death rates to those of its neighbors shows that Governor Walz' shutdown provided no benefit to the state:

10

### TOTAL CASES:



* Large jumps in the Cumulative Deaths for the US Total and New Jersey on June 25, 2020 are due to New Jersey newly reporting both probable and cumulative deaths. Case and Death Data: COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University. Testing and Hospitalization Data: The COVID Tracking Project. There are also 152 cases and 3 deaths from the Grand Princess and Diamond Princess cruise ships (not displayed). See Sources/Notes for links to sources.

### TOTAL DEATHS:



* Large jumps in the Cumulative Deaths for the US Total and New Jersey on June 25, 2020 are due to New Jersey newly reporting both probable and cumulative deaths. Case and Death Data: COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University. Testing and Hospitalization Data: The COVID Tracking Project. There are also 152 cases and 3 deaths from the Grand Princess and Diamond Princess cruise ships (not displayed). See Sources/Notes for links to sources.

(Dickey Decl. Ex. 8). (Legend: MN: Upper Green; IA: Upper Light Blue; WI: Upper Dark Blue; ND: Lower Light Blue; SD: Lower Green).

Despite Defendants' discriminatory shutdown, as of July 28, Minnesota has fared worse than all of its neighbors in terms of deaths per million citizens:

| State | Cases per million | Deaths per million |
|-------|-------------------|--------------------|
| Minnesota | 9,270 | 287.3 |
| Wisconsin | 8,617 | 155.4 |
| Iowa | 13,559 | 265.9 |
| North Dakota | 8,058 | 131.2 |
| South Dakota | 9,599 | 139.0[2] |

The sad reality is, Defendants' discrimination between non-PPAs and Plaintiffs and its resultant economic damage cannot be said to be substantially related to public health. Rather, it is based on bad modeling whipped up over a weekend by recent college grads and proven to be wrong by several orders of magnitude. Minnesota's neighbors have not shut down their economies (other than Wisconsin until its shutdown was struck down on May 13), yet they have fared better than Minnesota in terms of deaths per million, and as well as Minnesota (other than Iowa) in cases per million. And, as the graphs above show, there is no evidence that Minnesota's approach created a discernible downward trend or 'flattening' of cases or deaths any better than Minnesota's neighbors.

---

[2] (Dickey Decl. Ex. 8).

Yet, Defendants soldier on in defending these ineffectual and harmful policies. But they do not do so even-handedly or constitutionally.

## VI.     <u>The Attorney General Has Actively, Yet Selectively, Enforced the EOs.</u>

EO 20-74 threatens a penalty for violation by individuals of up to 90 days in jail and up to a $1,000 fine for individuals under Minn. Stat. § 12.45. (Kramer Decl. Ex. 17 p. 17). EO 20-74 also threatens a penalty for violation of up to a year of imprisonment and a $3,000 fine for business owners without citing to any statutory authority for that higher penalty. EO 20-74 also threatens that the Attorney General may seek civil relief under Minn. Stat. § 8.31 of up to $25,000 per occurrence for businesses violating EO 20-74. *Id.*

Attorney General Ellison stated on April 8 that he would "use the full enforcement power that the Order extends to my office to ensure" compliance with the shutdown orders. (Dickey Decl. Ex. 9). The Attorney General has taken action, as recently as July 31, against businesses who allegedly violate or threaten to violate the EOs, including EO 20-74. (Dickey Decl. Ex. 10). Governor Walz has threatened to "dial back" Plaintiffs' rights to operate their businesses. (*E.g.*, Dickey Decl. Ex. 11).

While the Attorney General has threatened businesses and churches with the penalties Governor Walz authorized in EO 20-74, enforcement has not been even-handed. After the tragic death of George Floyd in Minneapolis on May 25, thousands of Minnesotans began exercising their First Amendment rights by protesting the treatment of its African-American citizens by some police, openly violating then-in-place EOs 20-56, 20-62, and 20-63. AG Ellison did not enforce the Governor's EOs then. Nor can the undersigned find evidence in the public record that AG Ellison enforced the Governor's

orders against those who went beyond their First Amendment rights and burned Twin Cities buildings and businesses. Instead, AG Ellison made an ineffectual plea for compliance with curfew orders. (Dickey Decl. Ex. 12).

In addition, when Governor Walz himself openly violated EOs 20-62 and 20-63 by attending the Minneapolis memorial service of George Floyd, Ellison did nothing. Walz even admitted his violation. (Dickey Decl. Ex. 13). Walz then said: "Denying that to happen as a healing on a broader, societal well-being, I don't think would have been a good decision, but we probably could have done a little better as far as social distancing." *Id.*

Plaintiffs praise the Governor's and the nonviolent protesters' exercise of their First Amendment rights, and simply want to be afforded the same deference by the Defendants. Instead, Defendants arbitrarily and capriciously single out Plaintiffs and similar entities for enforcement. Attorney General Ellison has been a tiger against businesses that allegedly violate the EOs, but a housecat against thousands of people openly defying the orders via public protests. Consequently, the Governor's EOs are unconstitutional and must be enjoined.

## ARGUMENT AND AUTHORITIES

Plaintiffs' claims in this lawsuit compass three categories: (1) the Plaintiff churches' claims for breach of their First Amendment rights; (2) the Plaintiff businesses' claims for violation of their equal protection rights under the Fourteenth Amendment; and (3) the Plaintiff businesses' claims for just compensation.

Defendants move to dismiss the SAC for lack of subject-matter jurisdiction, for failure to state a claim on which relief can be granted, and under theories of abstention.

Within the subject-matter jurisdiction category, Defendants argue that Plaintiffs have no standing to sue; that Defendants have sovereign immunity; and that Governor Walz individually has qualified immunity. Within the Rule 12(b)(6) category, Defendants argue that *Jacobson v. Massachusetts* forecloses Plaintiffs' claims; that Plaintiffs fail to state an equal protection violation; and that Plaintiffs fail to state a takings claim. Defendants also claim that this Court should abstain from entertaining this case.

To the contrary, Plaintiffs have alleged substantial damages as a direct result of Defendants' conduct, and they require this Court's intervention to make them whole. Plaintiffs have been arbitrarily and unfairly treated in a different way than similar businesses and groups of people. Plaintiffs have been forbidden from working and offering goods and services to the public, but they have not been paid for the State's taking of their entire businesses and means of making a living. The Court should deny Defendants' motion to dismiss and allow Plaintiffs to make their case based on the uncontested facts that they have been discriminated against and have suffered substantial injury deserving compensation.

## I.   <u>Standard of Review.</u>

Under Federal Rule of Civil Procedure 12(b)(1), a court may only grant a motion to dismiss for lack of subject-matter jurisdiction on a facial attack if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 2002). Defendants' arguments center on the allegations of the SAC; thus, Defendants have mounted a facial attack on subject-matter jurisdiction. *E.g., Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908

(8th Cir. 2016). The same standard applies for motions to dismiss proceeding under Federal Rule of Civil Procedure 12(b)(6). *Id.*

## II.    The Court Has Subject-Matter Jurisdiction Over This Case.

The Court has subject-matter jurisdiction over this case because Plaintiffs have standing to sue and Defendants are not immune from suit.

### A.    Plaintiffs Have Standing.

Defendants argue that the Church Plaintiffs do not have standing to sue because their injuries are not fairly traceable to Defendants, and Plaintiffs' injuries will not be redressed by the relief sought in the SAC. Defendants fail to identify essential allegations in the SAC that undermine their argument, and this Court's order would immediately redress the constitutional and money-damages injuries incurred by Plaintiffs.

First, Defendants cite paragraphs 121, 125, 131, and 135 of the SAC related to the Church Plaintiffs' standing, but they do not discuss paragraphs 127 and 138, which allege that each of the Church Plaintiffs can only operate at 50% capacity, while "Critical" non-PPAs can operate in full.

These allegations of disparate treatment give rise to injuries-in-fact under the Equal Protection Clause of the Fourteenth Amendment:

> The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Likewise, these allegations give rise to claims under the First Amendment:

> The "First Amendment is a kind of Equal Protection Clause for ideas." . . . .
> When the constitutional violation is unequal treatment, as it is here, a court
> theoretically can cure that unequal treatment either by extending the benefits
> or burdens to the exempted class, or by nullifying the benefits or burdens for
> all.

*Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2354 (2020).

The Governor's orders impose a different standard on the Church Plaintiffs than on "Critical" non-PPAs. The injuries can be redressed by removing that distinction. The Church Plaintiffs' injuries are thus fairly traceable to Defendants' conduct, as alleged in the SAC.

Defendants bluntly claim that places of worship across Minnesota must shift all of their services to drive-ins or they are "inflicting harm on themselves." (Defs.' Mem. 10-11). First, Defendants cannot define for Northland and LWCC what it means to "not forsak[e] the assembling of ourselves together." (SAC ¶¶122, 132; Hebrews 10:25 (KJV)). Second, Defendants' proposal is clearly unworkable. One can only imagine the myriad problems neighbors would have with Mac Hammond of Living Word Christian Center, for example, addressing hundreds of cars with a loudspeaker and a few amps in its parking lot—not to mention the worship band's outdoor performance. And, Defendants' proposed solution ignores that constitutional harm is created by the imposition of barriers, not the failure of the party burdened to find ways to cope. *Ne. Fla.*, 508 U.S. at 666. A plaintiff does not have to abandon paid-for space and divert resources to have worship in parking lots while offices host their usual workforce.

Along these same lines, Plaintiffs' injuries are redressable by a judgment in their favor. Defendants argue that the "real world implications of COVID-19" mean that people

will not start packing the Church Plaintiffs' pews or aisles in the Business Plaintiffs' stores

if the Court orders judgment in Plaintiffs' favor. But the Supreme Court has clearly held:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

*Ne. Fla.*, 508 U.S. at 666; *see also Regents of Univ. of California v. Bakke*, 438 U.S. 265,

281 n. 14 (1978) ("even if Bakke had been unable to prove that he would have been

admitted in the absence of the special program, it would not follow that he lacked

standing"). Whether Plaintiffs will be able to fill the pews or the aisles of their stores absent

the barriers imposed by EO 20-74 is irrelevant to standing.[3] What matters is whether

Defendants have imposed a barrier on them which they have not imposed on "Critical"

non-PPAs. They have, and the Court can redress Plaintiffs' injuries by removing that

barrier.

### B.     Defendants Are Not Immune From Suit.

Defendants argue that both the Governor and the Attorney General are immune

from suit in their official capacity as sovereigns under the Eleventh Amendment. (Defs.'

Mem. 12-14). Neither is immune from suit given the facts of this case.

---

[3] *Amato v. Elicker* is not on point. It dealt with a motion for temporary injunctive relief where the court did not have a record showing that the businesses would reopen. No. 3:20-cv-464 (MPS), 2020 WL 2542788, at *6 n.6 (D. Conn. May 19, 2020). Here, the Court only needs to review the SAC, and Plaintiffs have alleged their desire to operate in full subject to the same restrictions as Target, Walmart, the Mall of America, etc. SAC ¶¶128, 139, 153, 164, 178.

1.     *Ex parte Young* **Allows Suit Against the Governor.**

Defendants argue that the Governor is immune from suit in his official capacity because, generally, the enforcement of criminal statutes in Minnesota is delegated to the city and county attorneys and because the Governor has not threatened to sue Plaintiffs. Defs.' Mem. 13-14. These arguments fail under the circumstances of this case.

The Eighth Circuit has held that a state's governor may be sued under *Ex parte Young* when the suit seeks prospective relief and the Governor has a sufficient connection with the enforcement of the legal provision at issue. *E.g., Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), *abrogated on other grounds by Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). In *Bruning*, for example, the Nebraska governor was subject to suit under *Ex parte Young* because he had "broad powers to enforce the State's Constitution and statutes." 455 F.3d at 863.

The constitution cited in *Bruning* states, "The supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed and the affairs of the state efficiently and economically administered." Neb. Const. art. IV, § 6. The statute cited in that case states, "Pursuant to his constitutional duty to take care that the laws be faithfully executed, whenever it shall come to the attention of the Governor that any agency charged with the implementation of any act of the Legislature is failing to implement such act, he shall immediately in writing order the agency to commence implementation." Neb. Stat. § 84-731.

As in *Bruning*, the Minnesota Constitution states that the Governor "shall take care that the laws be faithfully executed." Minn. Const. art. V, § 3. In addition, section 12.21

attempts to give the Governor broad enforcement powers, including the power to "carry out the provisions of this chapter" and "delegate administrative authority vested in the governor under this chapter." Subds. 1 & 3(6). The Governor did just that by 'deputizing' the Attorney General and city and county attorneys to enforce the EOs, such as in EO 20-74, ¶11. These provisions of law are akin to *Bruning*. Together, they subject the Governor to suit in his official capacity for Plaintiffs' claims for prospective relief under *Ex parte Young*.

2.      **The Attorney General Has Been Enforcing the EOs Against Citizens.**

It is not surprising that Defendants devote little time to arguing that the Attorney General is immune from suit under *Ex parte Young*. AG Ellison is specifically tasked with enforcing EO 20-74 by Governor Walz. And, he has openly and actively enforced Governor Walz' executive orders and has threatened the same, as recently as July 31.

Further, *281 CARE Committee v. Arneson* subjects the Attorney General to suit in this case. In the 2011 iteration of that case, the Eighth Circuit held that the Attorney General was a "potentially proper defendant" at the motion-to-dismiss stage because of her connection with the enforcement of Minn. Stat. § 211B.06 and her ability to bring civil penalty actions under Minn. Stat. § 8.01. 638 F.3d 621, 633 (8th Cir. 2011). Consistently, Attorney General Ellison is a 'potentially proper defendant' in this case.

However, even if this were *summary judgment*, Attorney General Ellison would be a proper defendant under *Ex parte Young*. In the 2014 iteration of *281 CARE Committee* on summary judgment, the Eighth Circuit only dismissed the AG after she filed an affidavit

swearing that her office had never enforced Minn. Stat. § 211B.06 and would never enforce that law against the plaintiffs or anyone similarly situated. 766 F.3d 774, 796 (8th Cir. 2014). Without these assurances, she would not have been dismissed. *See id.*

Attorney General Ellison could not truthfully make the sworn statements that Attorney General Swanson did. On July 31, Attorney General Ellison filed an enforcement action against a rodeo that allegedly violated EO 20-74. In addition, on May 17, AG Ellison brought suit against a bar that threatened noncompliance. Those lawsuits are ongoing.

Attorney General Ellison has a "particular duty to enforce the [order] in question and a demonstrated willingness to exercise that duty." *281 CARE Comm.*, 766 F.3d at 797 (quoting *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014)). There is no doubt that he is subject to suit under *Ex parte Young*.

### C.   Governor Walz Does Not Have Qualified Immunity.

Defendants argue that Governor Walz, individually, has qualified immunity "because Plaintiffs have not alleged violation of a constitutional right and cannot demonstrate that any such right was clearly established at the time of the alleged violation." (Defs.' Mem. 15). Defendants are wrong about both prongs of the qualified immunity analysis.

Qualified immunity applies where an official's actions are objectively reasonable when "assessed in light of the legal rules that were 'clearly established' at the time" the actions were taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified

immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640.

Thus, for example, where plaintiffs in civil commitment allege that they have not been provided adequate kosher food, the official defendants are not entitled to qualified immunity because the complaint asserts a violation of First Amendment rights. *Daywitt v. Moser*, No. 17-cv-1720 (WMW/LIB), 2019 WL 5104804, at *14 (D. Minn. June 5, 2019), *report and recommendation adopted as modified by Daywitt v. Moser*, 2019 WL 4387359, at *4 (D. Minn. Sept. 13, 2019) (Wright, J.). This is because the allegations of failure to provide adequate kosher food, if proven, would "substantially burden[ the plaintiffs'] right to practice their religion," and "it is well-established that it can be a violation of clear constitutional rights to substantially burden the free exercise of religion." *Daywitt*, 2019 WL 5104804, at *14 (adopted by 2019 WL 4387359, at *4). Similarly, official defendants are not entitled to qualified immunity in the face of allegations of Equal Protection Clause violations based on "arbitrary classifications." *Mathers v. Wright*, 636 F.3d 396, 402 (8th Cir. 2011).

The SAC states claims for relief for Defendants' violations of Plaintiffs' constitutional rights. Defendants themselves identify Plaintiffs' claims for violations of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Takings Clause of the Fifth Amendment in their analysis. (*E.g.,* Defs.' Mem. 18-21). Second, as developed more fully *infra*, the Church Plaintiffs' First Amendment right against substantial burdens on their free exercise of religion, in this case due to the Defendants' disparate treatment, is clearly established. Where a governor makes numerous

exceptions for secular activities but fails to exempt similar religious conduct, such action violates the First Amendment. *E.g., Roberts v. Neace*, 958 F.3d 409, 413-14 (6th Cir. 2020). Likewise, the Business Plaintiffs' rights against arbitrary and capricious distinctions between them and other similarly situated entities is clearly established. *E.g., Mathers*, 636 F.3d at 402.

The SAC alleges that Governor Walz' conduct, individually, violates Plaintiffs' clearly established constitutional rights. These allegations are sufficient to deny Governor Walz qualified immunity in his individual capacity.

## III.   The Second Amended Complaint Alleges Plausible Claims for Relief.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must only contain a short and plain statement of the claim showing that the pleader is entitled to relief. Consistently,

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs have stated claims for relief on all four counts in the SAC. Consequently, the Court should deny Defendants' motion to dismiss.

### A.   *Jacobson* Does Not Command a Different Level of Scrutiny Than Usual for Plaintiffs' Constitutional Claims.

In their attack on the SAC's plausibility, Defendants first cite to the 1905 *Jacobson v. Massachusetts* decision. (Defs.' Mem. 16-21). There is some superficial similarity between the *Jacobson* case and today's legal challenges to government overreach, but

*Jacobson* and this case are dissimilar in key ways. In addition, *Jacobson* does not lower the constitutional bar for the government; rather, *Jacobson*'s constitutional scrutiny is simply the language Justice Harlan commonly used to describe Fourteenth Amendment analysis that has since been honed over the last century-plus.

First, *Jacobson* dealt with a legislative enactment based on the Massachusetts legislature's use of its legislative authority. Here, Governor Walz has illegally used legislative power, as discussed in more detail *infra*, and his actions are void and thus inherently arbitrary and capricious.

Second, *Jacobson* is not a special pandemic case, and its formulation of the scrutiny to be applied to alleged Fourteenth Amendment violations has been significantly supplemented by over a century of Supreme Court jurisprudence. The Defendants appear to tout *Jacobson* as a sort of special standard of review to be applied in the pandemic context. (Defs.' Mem. 16-17). However, the *Jacobson* standard is ***not*** a creature only of the smallpox epidemic facing Massachusetts in 1905. Rather, this was Justice Harlan's common formulation for evaluating Fourteenth Amendment challenges to statutes that allegedly protected "public health, public morals, and public safety."[4] The Supreme Court

---

[4] Justice Harlan used this standard repeatedly across contexts, with minor rhetorical variations. *E.g., Lochner v. New York*, 198 U.S. 45, 68 (1905) (Harlan, J., dissenting) ("In *Jacobson* v. *Massachusetts*, . . . we said that the power of the courts to review legislative action in respect of a matter affecting the general welfare exists *only* 'when . . . a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law."); *California Reduction Co. v. Sanitary Reduction Works of San Francisco*, 199 U.S. 306, 318-19 (1905) (Harlan, J.) ("[I]f a regulation enacted by competent public authority avowedly for the protection of the public health has a real, substantial relation to that object, the courts will

left Justice Harlan's language behind decades ago in the First Amendment and Equal Protection contexts. Instead of the vague *Jacobson* language of more than a century ago, the Supreme Court uses varying levels of scrutiny on equal protection claims, *e.g., City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985) (describing levels of scrutiny), and First Amendment claims, *e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Employment Div. v. Smith*, 494 U.S. 872, 881 (1990).

It is reasonable that *Jacobson* has been supplemented by subsequent case law. No offense to Justice Harlan, but *Jacobson* leaves courts to wonder what is a "palpable conflict with the Constitution." 197 U.S. at 31. Subsequent jurisprudence has supplied more robust explications of the analysis to be applied to the invasions of Plaintiffs' rights alleged in this case. Courts which have failed to recognize this have also failed to analyze Justice Harlan's common formulation of Fourteenth Amendment scrutiny, which, as shown in footnote 4,

---

not strike it down upon grounds merely of public policy or expediency."); *Booth v. People of State of Illinois*, 184 U.S. 425, 429 (1902) (Harlan, J.) ("the courts cannot interfere, unless . . . they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law"); *Atkin v. State of Kansas*, 191 U.S. 207, 223 (1903) (Harlan, J.) ("[L]egislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution."); *State of Minnesota v. Barber*, 136 U.S. 313, 320 (1890) (Harlan, J.) ("[I]t is our duty to inquire, in respect to the statute before us, not only whether there is a real or substantial relation between its avowed objects and the means devised for attaining those objects, but whether . . . it impairs or destroys rights secured by the constitution of the United States."); *Mugler v. Kansas*, 123 U.S. 623, 661 (1887) (Harlan, J.) ("If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution.").

he applied to forced vaccinations (*Jacobson*), wage and hour laws (*Lochner* in dissent and *Atkin*), municipal garbage ordinances (*California Reduction Co*.), a prohibition against the sale of grain options (*Booth*), sales of meat (*Barber*), and liquor laws (*Mugler*).

To be sure, Chief Justice Roberts recently referenced *Jacobson* in his concurrence in *South Bay Pentecostal Church v. Newsom*. 140 S. Ct. 1613 (Mem.) (2020). However, he only referenced *Jacobson* to establish the duty of the state to protect its citizens under the Constitution. *Id.* at 1613. Chief Justice Roberts also stated that his (brief) analysis was based on the circumstances before him: "a party seek[ing] emergency relief in an interlocutory posture." *Id.* at 1614. This motion is on the merits, not one for temporary relief. In addition, Chief Justice Roberts was not faced with a restriction like the one here— he says, "the Order exempts or treats more leniently ***only dissimilar activities*** . . . in which people neither congregate in large groups nor remain in close proximity for extended periods." *Id.* at 1613 (emphasis added). Under EO 20-74, in contrast, people can go to office buildings, sit at their desks, and talk to coworkers for 8 hours a day, 5 days a week, as long as they are "Critical" or non-PPAs. If they are not the favored class, like Plaintiffs, they cannot. *South Bay Pentecostal*, even apart from the different procedural postures of the cases, is not on point here.

The Eighth Circuit in *In re Rutledge* also applied *Jacobson* to a petition for a writ of mandamus to dissolve a TRO, but not a decision on the merits. 956 F.3d 1018, 1027-32 (8th Cir. 2020). Even so, *Rutledge* analyzed whether the Arkansas order at issue unconstitutionally infringed on the right to an abortion under the modern *Gonzales* and

*Casey* standards. *Id.* at 1029-32. *Rutledge* does not mean that the Court can bypass the ordinary constitutional analysis in evaluating a motion to dismiss.

Third, *Jacobson* was a challenge to Massachusetts' law forcing ***all citizens*** over the age of 21 to be vaccinated against smallpox. 197 U.S. 11, 12, 30 (1905) ("But this cannot be deemed a denial of the equal protection of the laws to adults; for the statute is applicable equally to all in like condition"). *Jacobson* did not, therefore, address a law that contained a host of exceptions that undermined its general applicability. *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *6 (D. Kan. Apr. 18, 2020) ("*Smith, Abbott, Jacobson*, and similar cases do not provide the best framework in which to evaluate the Governor's executive orders because all those cases deal with laws that are facially neutral and generally applicable."). EO 20-74's exceptions are the basis for the Plaintiffs' claims. Thus, *Jacobson* has no application to Plaintiffs' equal protection and First Amendment claims by its own terms.

### B. Even *Applying* Defendants' Misunderstanding of *Jacobson*, Defendants' Motion Fails.

*Jacobson* holds that a Court may strike down a legal provision as unconstitutional if it is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law" or has no "real or substantial relation to the public health crisis." *In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020). EO 20-74 plainly and palpably[5] invades Plaintiffs'

---

[5] Plaintiffs struggle to understand exactly what Defendants mean when they describe these terms—they proffer no description of what kind of scrutiny should be applied to EO 20-74. What exactly would constitute a "plain and palpable" invasion? Defendants do not say.

bedrock rights to the free exercise of religion, equal protection of the laws, and just compensation.

First, Plaintiffs' rights alleged in the SAC are "secured by the fundamental law" under the *Jacobson* formula. "Secured by fundamental law" is not the equivalent of "burdening a fundamental right." Justice Harlan would have understood that better than most, as he railed against the equal protection violation of "separate but equal" in his thundering dissent in *Plessy v. Ferguson*. 163 U.S. 537, 555 (1896) (Harlan, J., dissenting). Justice Harlan stated that "the fourteenth amendment . . . added greatly to the dignity and glory of American citizenship, and to the security of personal liberty, by declaring that . . . nor shall any state deprive any person of . . . the equal protection of the laws." *Id.*

Courts that have used phrases similar to "secured by the fundamental law" have found that equal protection violations are an "affront [to] fundamental law embodied in the constitution." *In re Marriage of Kohring*, 999 S.W.2d 228, 231 (Mo. 1999) (en banc); *accord Boron Oil Co. v. City of Franklin*, 2 Pa. Cmwlth. 152, 160-61 (1971) ("This unique treatment can only be considered a clear, palpable and plain violation of the fundamental law of equal protection."); *In re Charge to Grand Jury*, 30 F. Cas. 987, 988 (C.C.D. W. Va. 1870) ("all citizens are under the fundamental law of the land entitled to equal privileges, and the equal protection of the law"); *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 316 (2014) (Scalia, J., concurring) ("It is precisely this understanding . . . of the federal Equal Protection Clause that the people of the State of Michigan have adopted for their own fundamental law.").

Likewise, the free exercise clause of the First Amendment represents a right "secured by the fundamental law." Even Defendants admit this in their analysis. (Defs.' Mem. 20 (quoting *Mass. Bd. Of Ret. v. Murgia*, 427 U.S. 307, 312 n.3 (1976)).

Finally, the right to just compensation under the Takings Clause is also a right "secured by the fundamental law." It is enshrined in the Fifth Amendment to the Constitution and unquestionably a fundamental right of every American:

> Private property, the Constitution provides, shall not be taken for public use without just compensation, and it is clear that there are few safeguards ordained in the fundamental law against oppression and the exercise of arbitrary power of more ancient origin or of greater value to the citizen, as the provision for compensation, except in certain extreme cases, is a condition precedent annexed to the right of the government to deprive the owner of his property without his consent.

*United States v. Russell*, 80 U.S. 623, 627 (1871). In fact, the takings power "cannot be exercised except upon condition that just compensation shall be made to the owner." *Bauman v. Ross*, 167 U.S. 548, 574 (1897).

Second, as will be shown below, EO 20-74 violates these rights secured by fundamental law.

Third, the ***distinctions drawn*** by EO 20-74 are not substantially related to public health because of their underinclusiveness and basis on publicly discredited models. Plaintiffs do not object to Defendants' characterization of EO 20-74 itself as related to health—how could it not be? But the issue here is not the entire EO—it's the arbitrary and unfair distinctions that it draws.[6] Here, under EO 20-74, people can go to the office for

---

[6] This is where it gets hard to apply *Jacobson,* because *Jacobson* was a generally applicable law—everybody over 21 had to be vaccinated. And, this is where Chief Justice Roberts'

"Critical," non-PPA work and spend 8 hours a day, 5 days a week there. How is that dissimilar or less dangerous under the Defendants' view of COVID-19 than going to church for one to two hours, once a week? Likewise, browsing the aisles at Myron's Cards and Gifts cannot be dissimilar from browsing the aisles at Target or CVS. These distinctions are arbitrary and capricious, and thus not related to public health. The First and Fourteenth Amendments do not tolerate an economic lottery arbitrarily assigning winners and losers.

Also important, these distinctions were originally drawn in March, but by June, when EO 20-74 was ordered, data clearly showed that the Defendants' open discrimination has been no more effective at stopping or slowing COVID-19 than the non-discrimination applied by neighboring states. *See supra*, facts section V. Thus, at the time of EO 20-74, these distinctions could not have been substantially related to public health.

      **C.**     **Defendants' Distinctions Between the Plaintiff Churches and "Critical" Non-PPAs Are Not Narrowly Tailored to Serve a Compelling Government Interest.**

Defendants only analyze the Church Plaintiffs' First Amendment claims under *Jacobson*, but as noted above, *Jacobson* (like *Employment Division v. Smith*) only applies to neutral laws of general applicability, such as where everyone must be vaccinated. *Jacobson*, 197 U.S. at 30; *First Baptist Church*, 2020 WL 1910021, at *6. Here, Defendants are trying to justify an executive order that treats churches and "Critical" non-PPAs

---

concurrence in *South Bay Pentecostal* becomes less valuable, as the Chief Justice there noted that "the [California] Order exempts or treats more leniently only ***dissimilar*** activities." 140 S. Ct. at 1613 (emphasis added).

differently. Thus, the distinctions that Defendants draw must be subjected to strict scrutiny, much like the "public health" law in *Lukumi*.

Under strict scrutiny, EO 20-74 is unconstitutional, as the State must prove that limiting Plaintiffs' church services while allowing "Critical" non-PPAs to operate in full "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546. (cleaned up) Defendants cannot satisfy this "highest level of review." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016).

First, Defendants' interest in curbing the spread of the COVID-19 may generally be considered compelling, but courts cannot stop there and assume an interest is compelling—courts must rather "scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Burwell v. Hobby Lobby, Stores, Inc.*, 573 U.S. 682, 726-27 (2014) (internal markings omitted). Even "plausible hypotheses are not enough to satisfy strict scrutiny," *Contractors Ass'n of E. Pa. v. City of Phila.*, 6 F.3d 990, 1008 (3d Cir. 1993), and "ambiguous proof will not suffice," *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 800 (2011).

Thus, "broadly formulated" statewide interests and generalized descriptions of health risk, like those referenced in EO 20-74 and undermined by several months of data, are not compelling. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). Moreover, "a law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547. (internal markings omitted) Here, Defendants are apparently willing to crack down on churches and businesses, but haven't applied EO 20-

31

74 or its predecessors to protesters exercising their own First Amendment rights. Defendants' unequal treatment plainly and palpably violates the First Amendment.

Second, EO 20-74 is not narrowly tailored, or even reasonably tailored, to meet the interest of curbing the spread of COVID-19. First, EO 20-74 treats religion as less important than "Critical" non-PPA secular activities, such as office work. EO 20-74 does not provide a scientific or public health basis for treating religion less favorably than these "Critical" businesses. People going to work and interacting with one other in indoor spaces poses at least the same danger related to the spread of COVID-19 under Defendants' expressed theories. Plaintiffs' church services, when conducted with adequate social distancing and public health protocol, do not present a greater risk than the businesses and activities expressly allowed under EO 20-74. There are no circumstances unique to socially-distanced church services that have been cited by the Governor as posing public health risks that do not exist in other similar settings such as an office building where people are allowed to work if they cannot perform their job duties at home. In fact, in offices, people gather and are near one another, touching the same surfaces, for 8 hours a day, 5 days a week, while churches meet for 1-2 hours once or twice a week. Yet, the former facilities are exempt under the EOs.

The State is not pursuing its purported interest evenhandedly. Other courts have struck down similar COVID-19-related orders for this very reason. *Roberts v. Neace*, No. 20-5465, 2020 WL 2316679, at *5 (6th Cir. May 9, 2020); *First Baptist Church*, 2020 WL 1910021, at *7 ("The legitimate health and safety concerns arising from people attending religious services inside a church would logically be present with respect to . . . mass

gatherings at airports, offices, and production facilities."). And, as already discussed, in denying a TRO in *South Bay Pentecostal*, the Supreme Court noted that the order in question only treated dissimilar activities differently. 140 S. Ct. at 1613.

When the State bans in-person church gatherings of more than 50% of capacity and 250 people but allows businesses and individuals—many times the same individuals—to engage in activity that risks spreading the virus "in a similar or greater degree than [religious conduct] does," such regulations are unconstitutional. *Lukumi*, 508 U.S. at 543-44; *see also Roberts v. Neace*, 2020 WL 2316679, at *3 (6th Cir. May 9, 2020) ("[A]ren't the two groups of people often the *same people*—going to work on one day and going to worship on another? How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings? The distinction defies explanation."). EO 20-74 violates the Church Plaintiffs' First Amendment rights and must be enjoined.

### D.   Defendants' Arbitrary and Capricious Exemptions Violate the Equal Protection Clause.

The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.

*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Defendants' discrimination against Plaintiffs is the essence of "arbitrary." First, Governor Walz does not have the authority to issue his executive orders, so his *ultra vires* limitations on Plaintiffs are inherently arbitrary and constitutionally infirm. Second, EO 20-74 openly discriminates against similarly situated people and entities. Third, Attorney

33

General Ellison's threats of enforcement and demonstrated actions against other like businesses, but failure to enforce the EOs against protesters exercising their own First Amendment rights, demonstrates inequality and renders EO 20-74 unconstitutional.

### 1.      The Governor Had No Authority to Issue EO 20-74.

Because Governor Walz acted *ultra vires*—beyond his statutory authority conferred by Minnesota Statutes, Chapter 12—in issuing EO 20-74, his actions are therefore *per se* arbitrary and capricious and violate the Equal Protection Clause related to the Business Plaintiffs.

First, the Governor has no power to issue emergency executive orders under Chapter 12 based on a public health emergency. In 2005, H.F. No. 1555 was passed into law. That bill removed from the Governor the power to issue orders related to a "public health emergency" under Chapter 12. Thus, the Governor had no power to declare a COVID-19 "public health emergency" without further legislative enactment.

Second, the Governor failed to identify any basis-in-fact for the premise that he could seize power from the legislative branch of Minnesota's government. Defendants argue that the Governor did not need to—that he could declare an emergency at any time, for any reason, and without any factual support. (Defs.' Mem. 32-34). That is preposterous and directly contrary to section 12.31 and the Minnesota Constitution's Article III, Section. 1. Section 12.31 states that the Governor may declare a peacetime emergency "only when" a predicate condition "endangers life **and** property **and** local government resources are inadequate to handle the situation." Subd. 2(a) (emphasis added). Inherent in this requirement is that these conditions must *actually exist*. Defendants fail to show any facts

34

supporting Governor Walz's "say-so." (Defs.' Mem. 32-33). Defendants only identify implausible alleged endangerments to property, such as 'decontamination' costs, 'clean-up,' and 'business interruption.' Governor Walz cannot *impose* a business interruption and then claim it is a predicate to his authority. And, the premise that Minnesotans' property is *endangered* by having to sanitize their facilities and equipment is bizarre. The only danger to Minnesotans' property related to COVID-19 is the danger posed by Governor Walz himself in taking it from them.

Third, EO 20-74 illegally threatens businesses and their owners with up to a $3,000 fine and a year in jail for encouraging or requiring violation of the Orders. However, Chapter 12 does not authorize any higher or different punishment beyond $1,000 and 90 days regardless of the 'manner' of violation or 'who' violated the statute. Minn. Stat. § 12.45. Defendants make the breathtaking assertion that the Governor can set *any penalty he wants* related to a violation of the EOs. This is simply a misreading of section 12.45; the language "[u]nless a different penalty or punishment is specifically prescribed" does not give the Governor *carte blanche*. The Legislature has plenary authority to set criminal penalties under Minn. Stat. § 609.095. Section 12.45 allows for either a misdemeanor penalty of $1,000 or 90 days in jail, or a prosecution based on other penalties already created by the Legislature. Certain Minnesota state senators reminded the Governor of this in a letter on May 19. (Dickey Decl. Ex. 14). Likewise, the Governor cannot expand the Attorney General's powers under section 8.31 without a legislative enactment. The Attorney General has no statutory authority to either civilly or criminally prosecute violations of EO 20-74. Yet, he is doing just that.

Fourth, if Chapter 12 does give the Governor the powers that Defendants claim, it is an unconstitutional delegation of legislative authority. Section 12.32 purports to give the Governor's EOs the "full force and effect of law." EO 20-74 repeats this statement, and Defendants' argument here, if accepted, would make his rule over the state nearly absolute. The Minnesota Legislature "cannot delegate purely legislative power to any other body, person, board, or commission." *Lee v. Delmont*, 36 N.W.2d 530, 538 (Minn. 1949). This is Minnesota's non-delegation doctrine. Through the EOs, the Governor attempts to exercise purely legislative power that only the Legislature can exercise. Consequently, EO 20-74 is void because it is based on an unconstitutional delegation of power to the Governor.

Because the Governor had no authority to issue EO 20-74, it is inherently arbitrary and capricious, and the distinctions drawn between Plaintiffs and other Minnesotans violate the Equal Protection Clause.

## 2.    The EOs Discriminate Without Any Rational Justification.

Defendants claim that Plaintiffs fail to allege that they are similarly situated to entities treated differently. (Defs.' Mem. 22). This is simply untrue; Plaintiffs allege that they are no different than entities like Target and CVS throughout the SAC for purposes of the distinction drawn between them. *E.g.,* SAC ¶¶3, 5, 9. It would simply be an unfair reading of the SAC, inconsistent with the Rule 12 standard, to read out Plaintiffs' allegations of similarity to these favored entities for purposes of the distinctions drawn in EO 20-74.

Further, the issue is not whether Plaintiffs alleged that they are *exactly the same* as Target. Rather, the issue is whether the distinctions in EO 20-74 exempting businesses "that offer food and beverage not for on-premises consumption," as an example, are rationally related to Defendants' stated interest in stopping the spread of COVID-19. *Olech*, 528 U.S. at 564; *Merrifield v. Lockyer*, 547 F.3d 978, 990-92 (9th Cir. 2008); *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002). They are not.

For example, in *Olech*, where a village required a homeowner to grant a 33-foot easement to connect to the municipal water supply, but only required her neighbors to grant an 18-foot easement (even though they obviously didn't live in the same house), this was plausibly violative of the Equal Protection Clause. Likewise, in *Merrifield*, a statute exempted pest controllers who dealt with "bats, raccoons, skunks, and squirrels" from a licensing requirement, but it did not exempt those who dealt with "mice, rats, or pigeons," so it failed rational basis review because it was irrational. *Merrifield*, 547 F.3d at 988. There, the Ninth Circuit noted that the statute failed rational basis because the state drew the exemption line "based on what kinds of pests the business exterminates." *Id.* at 991. This is just like drawing the line for COVID spread based on what products one sells. In *Craigmiles*, the Sixth Circuit struck down a statute that required casket makers to get a funeral director license to sell caskets. 312 F.3d at 222. The statute violated the Equal Protection Clause because, even though the state argued there was a public health purpose to ensuring the quality of caskets, the licensing requirement did not advance that health purpose, as a casket made by a casket maker was not inherently more likely to leak than

that made by a funeral director. *Id.* at 225-26. If the state wanted to protect people from that danger, it could regulate the products directly to make them safer.

There is no basis for the state to claim that selling food or beverages makes a business less of a COVID-spreader than another. There is nothing about selling groceries that makes Target's aisles less dangerous for consumers than Myron's. There is nothing about selling ibuprofen that makes CVS' aisles less dangerous for consumers than Glow In One. The Defendants' exemptions in EO 20-74 are arbitrary and capricious and fail rational basis review under the Equal Protection Clause.

### 3.     The Attorney General Has Not Enforced the EOs Evenhandedly.

In *Olech*, the Supreme Court held that the Equal Protection Clause protects "against intentional and arbitrary discrimination, whether occasioned by express terms of a statute *or by its improper execution through duly constituted agents*. 528 U.S. at 564 (emphasis added).

As detailed above, Attorney General Ellison has been a tiger in enforcing the EOs, including EO 20-74, against some businesses, but a housecat when it comes to protesters openly violating EO 20-74 while exercising their First Amendment rights in the streets of the Twin Cities—even when those protests have turned violent. In fact, Attorney General Ellison failed to enforce the EOs at the memorial service of George Floyd in Minneapolis against the *Governor himself*. It is quite clear that Defendants are only enforcing the laws against those exercising rights they care less about. Like in *Olech*, the laws are the same

for protesters as for businesses, but they are not being applied evenhandedly. Consequently, EO 20-74 violates the Equal Protection Clause.

> **E.     Defendants Have Failed to Compensate Plaintiffs for the Taking of Their Property Via Governor Walz' Shutdown Orders.**

Whether analyzed under a categorical analysis or the *Penn Central* analysis, the SAC plausibly alleges a claim for relief under the Takings Clause of the Fifth Amendment. To put a point on this, Plaintiffs have submitted declarations indicating the type of evidence they will proffer to support both types of takings claims. These declarations are consistent with the facts alleged in the SAC. SAC ¶¶142-153, 157-164, 167-178.

> **1.     <u>The Shutdown EOs Constituted a Categorical Taking Because the Business Plaintiffs Were Entirely Prohibited From Operating.</u>**

"It is axiomatic that the Fifth Amendment's just compensation provision is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 318-19 (1987). Further, "temporary takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *Id.* at 318. Defendants' temporary taking of Plaintiffs' businesses requires compensation. Moreover, where the government literally bars an owner from his or her business and thus commandeers it, such action constitutes a "physical appropriation" that is a *per se* taking. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 323 (2002). And, takings are not limited to real estate—personal

property can be taken, *Horne v. Dep't of Agriculture*, 576 U.S. 350, 362-63 (2015), and the going concern of a business can be taken, and just compensation required. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 11-12 (1949).

In *First English*, a church owned a 21-acre piece of property in a canyon next to Mill Creek. In 1977, a forest fire destroyed thousands of acres and created a flood hazard that subsequently destroyed the church. In response to the flooding, Los Angeles County passed an ordinance that forbade construction or reconstruction on the property. The church sued. 482 U.S. at 307. The Supreme Court held that the ordinance was a regulatory taking that required just compensation. It did not matter that the church could have still held services on that property without a building—the ordinance effected a taking.

As described in the table *supra*, Defendants stripped Myron's, Glow In One, and AJ Hulse of all viable economic use of their property for months. This is a categorical taking. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 nn 7-8. (1992). Defendants appear to argue that no categorical taking occurred because, theoretically, Plaintiffs could have used their property in some other manner—perhaps repurposed their business entirely to fit the exemptions Defendants have allowed in EO 20-74. (Defs.' Mem. 24-25). Such a reading of the Fifth Amendment is contrary to the Supreme Court's holding in *First English*, where the church held fee title to the land but could not rebuild. Likewise, it is contrary to the Supreme Court's holding in *Kimball Laundry*, where the Supreme Court held that the United States had to compensate a laundromat for taking it over during World War II. Defendants fail to support their motion as it relates to a categorical taking.

40

2.     **Under Penn Central, Defendants Must Pay Plaintiffs Just Compensation.**

Defendants next argue that there is a pandemic exception to the Fifth Amendment under *Penn Central*. There is no basis for any such view of the *Penn Central* holding. Under *Penn Central*, Plaintiffs should be awarded just compensation in an amount to be determined at trial.

Defendants do not even attempt to argue that Plaintiffs have not borne tremendous economic losses which have interfered with their investment-backed expectations because of Defendants' shutdowns and now EO 20-74. (Defs.' Mem. 25-26). As such, Plaintiffs assume Defendants concede the first two prongs of *Penn Central*. On the third prong of the *Penn Central* analysis, the Court must analyze the character of the government action effecting the deprivation.

First, the shutdowns were not a "public program adjusting the benefits and burdens of economic life to promote the common good," like marginal income tax rate adjustments. *Penn Cent. Transp. Co. v. New York*, 438 U.S. 104, 124 (1978). Rather, they prohibited Plaintiffs from doing business, while others were allowed to. Discrimination is not a program protecting the public good under *Penn Central*.

Second, the character of the government action here is a selective shutdown of businesses based on factors unrelated to preventing the spread of COVID-19. It is not as though the state is shutting down *every* business; the problem is that the state shut down Plaintiffs and allowed other 'COVID-spreaders' to operate. Thus, this case is totally unlike *Zeman v. City of Minneapolis*, where the city disallowed rental of a property because of

multiple incidents of drug dealing and violence at the property. 552 N.W.2d 548, 549-50 (Minn. 1996). *Zeman* is a particularly appalling comparison and demonstrates Defendants' dim view of Plaintiffs' lawful businesses—as akin to criminal enterprises. But if this case really were like *Zeman*, the state would be shutting down all businesses, because every single exempted business can spread COVID-19.

Defendants also compare this case to others which have referenced "public health" concerns. *Penn Central* deals with this. Justice Brennan gave examples of the types of laws that could legitimately take property for public health concerns, such as outlawing brickyards in residential areas, the forced destruction of cedar trees, and excavation below the water table. Justice Brennan held that such restrictions could be considered <u>not</u> a taking because, in part, they were "applicable to all similarly situated property." 438 U.S. at 133 n.30. That is not the case here. Defendants cannot avoid compensating Plaintiffs for the losses they have been selectively forced to bear.

## IV.    <u>The Court Should Not Abstain From This Case.</u>

Plaintiffs hope that the state court plaintiffs win in their challenges to Governor Walz' orders. But even if they do, the Court should not abstain from adjudicating this action.

First, for the sake of clarity, Plaintiffs have argued the illegality of EO 20-74, as expressed in paragraph 240 of the SAC, because EO 20-74's illegality makes it *per se* arbitrary, capricious, and unconstitutional.[7]

---

[7] Plaintiffs are not seeking relief in the form of a writ of quo warranto in this action. Plaintiffs removed the quo warranto count but unintentionally left references to quo

Second, *Pullman* abstention would be inappropriate because EO 20-74 could not be construed in a way that would avoid the constitutional questions raised here. While the state court cases Defendants mention, (Defs.' Mem. 28-29), could result in a determination that Governor Walz did not have statutory authority to issue EO 20-74, the fact is that he issued it, and it hurt Plaintiffs. *Burris v. Cobb* is directly on point here: *Pullman* does not require abstention on the basis that "the [Minnesota] courts may fairly determine that the [Governor] exceeded [his] statutory authority in promulgating [the executive orders]." 808 F.3d 386, 388 (8th Cir. 2015). As in this case, Burris sought an injunction against enforcement of the state law in question, and the Eighth Circuit held it was irrelevant if Arkansas' courts struck down the law as exceeding statutory authority during the pendency of the federal case. The issue for *Pullman* abstention is whether such a determination "would avoid the constitutional questions raised in [the] complaint." *Id.* Here, as in *Burris*, it would not.

Third, *Colorado River* abstention would be inappropriate. *Colorado River* abstention is rare and should only occur where there are "exceptional" circumstances. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* at 813. Defendants fail to identify any decision of the Minnesota state courts that would "moot the federal constitutional question." *North Dakota v. Heydinger*, 825 F.3d 912, 918 (8th Cir. 2016). In addition, this case is much unlike *Spectra Comm'ns Grp., LLC v. Cameron*,

---

warranto in the SAC.

806 F.3d 1113 (8th Cir. 2015). In *Spectra*, the Eighth Circuit approved abstention because (1) there was a risk of piecemeal litigation, (2) the state court was a more complete action to decide the potentially conflicting matter, and (3) the state court action was filed first. *Id.* at 1121-22. Here, there is no risk of piecemeal litigation—the federal causes of action here are for injunctive relief and money damages under 42 U.S.C. § 1983 and for just compensation under the Takings Clause, not a state law writ of quo warranto. Also, this lawsuit was filed first and thus takes priority over the state court actions: this case was filed on May 6, *Schiffler* was filed on May 17, and *Free Minnesota* was filed on May 28. Most importantly, however, the overwhelming presence of the federal constitutional issues in this case weighs heavily against abstention, and the state court actions currently pending will not adjudicate *these Plaintiffs'* claims. *Spectra*, 806 F.3d at 1122.

Truly, the only effect of *Colorado River* abstention on these Plaintiffs' claims would be to waste their time and resources, as they would simply re-file the same claims in state court against the same defendants, just several months later. There is no prudence in that approach. Plaintiffs have presented federal constitutional claims that ought to be adjudicated by this Court.

## CONCLUSION

For the reasons set forth herein and in arguments of counsel, Plaintiffs request that the Court deny Defendants' motion to dismiss.

44

**UPPER MIDWEST LAW CENTER**

Dated:  August 3, 2020

Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 105
Golden Valley, Minnesota 55426
doug.seaton@umwlc.org
james.dickey@umwlc.org
(612) 428-7000

*Attorneys for Plaintiffs*