UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

─────────────────────────────────────────────────────────────

Northland Baptist Church of St. Paul,
Minnesota, et al.,

                          Plaintiffs,

     v.

Governor Tim Walz, *individually and in his
official capacity*, et al.,

                          Defendants.

Case No. 20-cv-1100 (WMW/BRT)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**

─────────────────────────────────────────────────────────────

This matter is before the Court on Defendants' motion to dismiss Plaintiffs' second amended complaint (complaint). (Dkt. 54.) For the reasons addressed below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

This case arises out of the State of Minnesota's response to the coronavirus (COVID-19) pandemic. Plaintiffs are two churches and one pastor (Faith-Based Plaintiffs), and an indoor recreation facility, a small retail business, a hair salon, and the owners of these businesses (Business Plaintiffs), all located in Minnesota. Defendant Tim Walz is the Governor of the State of Minnesota and is sued in his individual and official capacities. Defendant Keith Ellison is the Attorney General of the State of Minnesota and is sued in his official capacity only.

Beginning in March 2020, Governor Walz issued a series of executive orders (EOs) relating to the COVID-19 pandemic. On June 5, 2020, Governor Walz issued EO 20-74,

which is the primary EO challenged in this lawsuit.  As relevant here, EO 20-74 authorized houses of worship to hold worship services at up to 50 percent of the building's capacity, with a 250-person maximum.  Barbershops and cosmetology salons were subject to the same restrictions as houses of worship.  Places of public accommodation that were closed under prior EOs were authorized to have up to 25 percent of the fire marshal's occupancy limit for the space with a maximum of 250 occupants at once.  And "Non-Critical" businesses were required to implement sanitation and social-distancing guidelines.[1]

The Faith-Based Plaintiffs allege that Defendants, through EO 20-74, infringed on their right to freely exercise their religion (Count One) and their right to free speech and assembly (Count Two) in violation of the First Amendment to the United States Constitution and Article I, Sections 3 and 16 of the Minnesota Constitution.  The Business Plaintiffs allege that Defendants, though EO 20-74, infringed on their property rights in violation of the Takings Clause of the Fifth Amendment to the United States Constitution (Count Four).  And Plaintiffs allege that Defendants, through EO 20-74, infringed on their rights to equal protection in violation of the Fourteenth Amendment to the United States Constitution (Count Three).[2]

---

[1]     Governor Walz issued several additional EOs pertaining to the COVID-19 pandemic after the parties briefed and argued the pending motion.  Among them is EO 21-12, which is the EO currently in effect.  Material differences between EO 20-74 and EO 21-12 are addressed as relevant to the Court's legal analysis.

[2]     Although Plaintiffs' complaint includes one reference to "due process," the complaint lacks any pertinent factual allegations or legal analysis addressing due process with respect to any aspect of Plaintiffs' claims.  Therefore, the Court construes Plaintiffs' complaint to *not* include a due-process claim.

Defendants move to dismiss Plaintiffs' complaint, arguing that Plaintiffs lack standing, Defendants are immune from suit, the Court should abstain from deciding this case, and Plaintiffs have failed to state a claim on which relief can be granted. When evaluating the merit of a motion to dismiss, a district court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of the nonmoving party. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).

## ANALYSIS

### I.     Standing

Article III of the United States Constitution limits federal jurisdiction to actual cases and controversies. U.S. Const. art. III, § 2, cl.1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is a jurisdictional prerequisite and must be established before the merits of a claim may be reached. *See, e.g.*, *McCarney v. Ford Motor Co.*, 657 F.2d 230, 233 (8th Cir. 1981). Defendants argue that Plaintiffs lack standing.

To establish standing, a plaintiff must (1) allege to have suffered an injury in fact, (2) demonstrate a causal relationship between the opposing party's conduct and the alleged injury, and (3) demonstrate that the injury would likely be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. Here, Plaintiffs' satisfaction of the injury-in-fact requirement is uncontested. Defendants argue, however, that the Faith-Based Plaintiffs have failed to demonstrate that their injuries are fairly traceable to Defendants and that all of the Plaintiffs have failed to demonstrate that a favorable decision would redress their injuries. *Id.* Arguments as to these disputed elements are addressed in turn.

### A.      Traceability

To have standing, a plaintiff must allege an injury that is fairly traceable to the allegedly unlawful conduct and is not the consequence of independent actions of a third party that is not before the court. *Id.* at 560. An injury that is fairly traceable also must be "certainly impending," not speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401–02 (2013); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Importantly, the standing inquiry is not an assessment of the merits of the claim. *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012).

Defendants argue that, because the Faith-Based Plaintiffs' injuries are not fairly traceable to the actions of Defendants, the Faith-Based Plaintiffs fail to meet the causation element of standing. Typically, an injury is fairly traceable when the named defendants have the authority to enforce the complained-of provision of law. *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015). Here, the EOs issued by Governor Walz plainly confer civil and criminal enforcement power on the Minnesota Attorney General. And Governor Walz has statutory authority to direct the Attorney General to prosecute cases. Minn. Stat. § 8.01. The Faith-Based Plaintiffs have not provided examples of the State of Minnesota prosecuting faith-based organizations or congregants. Yet Plaintiffs argue, and Defendants do not dispute, that the Attorney General has taken action to enforce the EOs. Therefore, the Faith-Based Plaintiffs' alleged injuries are fairly traceable to the actions of Governor Walz and Attorney General Ellison.

Defendants also contend that the Faith-Based Plaintiffs could have hosted drive-in services but chose not to.[3]   Quoting *Clapper*, Defendants argue that the Faith-Based Plaintiffs cannot "manufacture standing merely by inflicting harm on themselves."   568 U.S. at 401–02.   But *Clapper* is inapposite. The plaintiffs in *Clapper* challenged the constitutionality of the Foreign Intelligence Surveillance Act (FISA), arguing that they were harmed because they were spending money on counter-surveillance measures, and that harm was fairly traceable to the FISA provision at issue.  *Id.* at 404–05, 407.   The Supreme Court of the United States concluded that the alleged harm was speculative.  *Id.* at 401–02.   Here, the Faith-Based Plaintiffs allege that the EOs have completely or partially inhibited their ability to congregate together in person.   These alleged harms are not speculative or self-inflicted.   Rather, the harms alleged are concrete injuries sustained, at least in part, because of the restrictions imposed by the EOs.   Moreover, the plaintiffs in *Clapper* had a "similar incentive" to alter their behavior both before and after FISA was enacted.  *Id.* at 417.   Here, no party argues that the Faith-Based Plaintiffs had a similar incentive to alter their worship practices before the EOs.   Therefore, *Clapper* does not govern this case.

Accordingly, Plaintiffs have satisfied the causation element of Article III standing.

---

[3]     This Court need not determine, for purposes of this Order, whether drive-in services are a substitute for in-person services.  Such a question would almost certainly require this Court to determine whether a drive-in service constitutes "assembling . . . together," *Hebrews* 10:25 (King James), and the Supreme Court has advised against scriptural assessment, *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("Courts are not arbiters of scriptural interpretation.").

**B.      Redressability**

The third element of Article III standing requires a plaintiff to demonstrate that it is likely, not merely speculative, that the remedy the plaintiff seeks can redress the alleged injuries. *Lujan*, 504 U.S. at 561; *Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019).

Defendants argue that Plaintiffs are unable to demonstrate that a favorable decision would redress Plaintiffs' injuries because "[c]ongregants and customers may still choose to stay home in order to avoid the virus, even if Plaintiffs' facilities are operating at 100 [percent]." But Defendants' characterization of Plaintiffs' injuries is inconsistent with the injuries that Plaintiffs allege. The Business Plaintiffs allege that they are injured because either they have been temporarily closed under some EOs, or they are unable to operate at the same capacity as critical businesses under EO 20-74. *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 319–20 (1978) (recognizing that a party may be injured by not being able to compete for the same opportunity). The Business Plaintiffs seek declaratory and injunctive relief authorizing them to operate at the same capacity as "Critical" businesses, and they seek monetary relief for losses incurred. If this Court were to hold that the EOs must treat the Business Plaintiffs in the same manner as "Critical" businesses are treated, and that the Business Plaintiffs must receive damages for the economic harms suffered, such relief would redress the harms that the Business Plaintiffs allege.

Similarly, the Faith-Based Plaintiffs suffer alleged harm because the EOs allegedly treat religious entities in an unequal, disfavored manner as compared with secular entities. The Faith-Based Plaintiffs state that removing the distinction between the Faith-Based

Plaintiffs and "Critical" businesses will redress their injuries.  "When the constitutional violation is unequal treatment, . . . a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens to all."  *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2354 (2020); *see also Heckler v. Mathews*, 465 U.S. 728, 737–40 (1984) (holding that plaintiff suffering unequal treatment had standing to seek "withdrawal of benefits from the favored class").  If this Court were to rule that the EOs must treat Faith-Based Plaintiffs in the same manner as "Critical" businesses are treated, that ruling would redress the alleged harm that the Faith-Based Plaintiffs experience.

As Plaintiffs have satisfied the redressability element of Article III standing, Defendants' motion to dismiss on this basis is denied.

## II.     Immunity

Defendants argue that Governor Walz and Attorney General Ellison in their official capacities are immune from suit based on the Eleventh Amendment to the United States Constitution.  Defendants also argue that Governor Walz in his individual capacity is subject to qualified immunity, and that Governor Walz and Attorney General Ellison in their official capacities are immune from Plaintiffs' state-law claims based on the *Pennhurst* doctrine.[4]  Defendants' immunity arguments are addressed in turn.

---

[4]     Defendants raise the issue of Eleventh Amendment sovereign immunity in their opening brief but cite *Pennhurst* specifically for the first time in their reply brief.  Courts typically do not address arguments raised for the first time in a reply brief.  However, Eleventh Amendment immunity implicates this Court's subject-matter jurisdiction. *Jones v. United States*, 255 F.3d 507, 511 (8th Cir. 2001); *but cf. Wis. Dep't of Corr. v. Schacht*,

A.       Eleventh Amendment Sovereign Immunity

Defendants seek to dismiss all claims against Governor Walz and Attorney General

Ellison in their official capacities on the basis that they are immune from suit.

"The Judicial power of the United States shall not be construed to extend to any suit

in law or equity, commenced or prosecuted against any one of the United States . . . ."  U.S.

Const. amend. XI.  The Eleventh Amendment establishes a general prohibition against suits

in federal court by a citizen of a state against their state or an officer or agency of that state.

*281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).  Sovereign immunity is a

threshold jurisdictional matter, properly addressable at any time.  *Lors v. Dean*, 746 F.3d

857, 861 (8th Cir. 2014).  The burden rests with the entity asserting Eleventh Amendment

sovereign immunity to show its entitlement to such immunity.  *United States ex rel. Fields*

*v. Bi–State Dev. Agency of the Missouri–Illinois Metro. Dist.*, 829 F.3d 598, 600 (8th Cir.

2016).

Eleventh Amendment sovereign immunity is not absolute.  *Doe v. Nebraska*, 345

F.3d 593, 597 (8th Cir. 2003).  Notwithstanding sovereign immunity, a state may be subject

to suit in federal court when (1) the state has unequivocally waived its sovereign immunity

---

524 U.S. 381, 391 (1998) (whether "Eleventh Amendment immunity is a matter of subject
matter jurisdiction [is] a question [the Supreme Court has] not decided").  Because subject-
matter jurisdiction is a threshold requirement in every federal lawsuit, *Green Acres Enters.,
Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005), the Court must consider
Defendants' *Pennhurst*-doctrine arguments, *Demery v. Kupperman*, 735 F.2d 1139, 1149
n.8 (9th Cir. 1984) ("[W]hen state officials raise an objection that eleventh amendment
immunity applies, a federal court must consider all relevant arguments whether or not
specifically advanced by the state officials.").

and consented to suit in federal court; or (2) Congress has unequivocally, through legislation, abrogated state immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). Here, nothing demonstrates that Minnesota has waived, or Congress has abrogated, Minnesota's Eleventh Amendment sovereign immunity rights.

Sovereign immunity also can be abrogated by the *Ex parte Young* doctrine. A plaintiff may proceed in a suit against a state official for prospective injunctive relief when: (1) the official has "some connection with the enforcement" of the challenged law, and (2) the official threatens and is "about to commence proceedings" to enforce the challenged law. *Ex parte Young*, 209 U.S. 123, 156–57 (1908). Here, Plaintiffs rely on the *Ex parte Young* doctrine to avoid sovereign immunity. Defendants counter that Governor Walz lacks a sufficient connection to the enforcement of the EOs to satisfy the first element of the *Ex parte Young* doctrine. And neither Governor Walz nor Attorney General Ellison is about to commence proceedings to enforce the EOs, Defendants contend. The Court addresses each argument.

### 1.     Connection with Enforcement

Defendants maintain that Plaintiffs fail to satisfy the first element of the *Ex parte Young* test because Governor Walz is not connected with enforcement of the EOs.[5] Citing

---

[5]     No party contests that Attorney General Ellison has "some connection with the enforcement" of EO 20-74, as the Attorney General is specifically tasked with enforcing EO 20-74. *See Ex parte Young*, 209 U.S. at 157; *see also Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) ("A suit for injunctive or declaratory relief avoids [sovereign] immunity if the official has some connection to the enforcement of the challenged laws."). The first element of the *Ex parte Young* test is satisfied as to Attorney General Ellison.

*Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), *abrogated on other grounds by Obergefell v. Hodges*, 576 U.S. 644 (2015), Plaintiffs counter that Governor Walz is sufficiently connected with enforcement of the EOs such that the first element of the *Ex parte Young* doctrine is satisfied.

The *Ex parte Young* exception to Eleventh Amendment sovereign immunity requires the official to have only *some* connection with enforcement. 209 U.S. at 156–57; *see also Minn. Voters All. v. Walz*, __ F. Supp. 3d __, 2020 WL 5869425, at *6–7 (D. Minn. Oct. 2, 2020) (concluding that both the Minnesota Attorney General and Minnesota Governor had sufficient connection with enforcement of challenged law in similar circumstances). A state official's connection with enforcement of a state statute may be specifically created by the act itself or arise out of general law. *Digit. Recognition Network*, 803 F.3d at 960. At the motion-to-dismiss stage, a federal court need only consider whether a plaintiff has plausibly identified a "*potentially* proper party for injunctive relief." *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005); *compare 281 Care Comm*, 638 F.3d at 626 (addressing *Ex parte Young* doctrine at motion-to-dismiss stage), *with 281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014) (addressing *Ex parte Young* doctrine at summary-judgment stage).

Plaintiffs rely on *Bruning* to support their contention that Governor Walz has some connection with enforcement such that this element of the *Ex parte Young* doctrine is satisfied. 455 F.3d 859.[6] In *Bruning*, the Eighth Circuit concluded that a governor's broad

---

[6]        Defendants do not address whether *Bruning* is applicable.

authority under a state constitution to ensure that the laws of the state are enforced satisfies the connection-with-enforcement element of the *Ex parte Young* doctrine. *Id.* at 864. The Eighth Circuit subsequently elaborated on this conclusion, recognizing that the reason the governor in *Bruning* had "some connection to the enforcement of the [state] Constitution [was] because [the governor] may direct the attorney general to file suit to enjoin application of an unconstitutional state statute." *Digit. Recognition Network*, 803 F.3d at 961; *accord Balogh v. Lombardi*, 816 F.3d 536, 546 (8th Cir. 2016) (explaining analysis in *Bruning* and *Digital Recognition Network*). Here, by granting the Governor of Minnesota authority to direct Minnesota's Attorney General to prosecute any person charged with an indictable offense, Minnesota law provides Governor Walz with more connection with enforcement than the governor in *Bruning* had. *See* Minn. Stat. § 8.01.[7] Therefore, Governor Walz, in his official capacity, has some connection with the enforcement of the EOs.

Relying on *State ex rel. Wild v. Otis*, 257 N.W.2d 361, 365 (Minn. 1977), Defendants argue that, although Minn. Stat. § 8.01 confers enforcement power on the

---

[7]    Moreover, at least one other court within this District has concluded at the motion-to-dismiss stage that Governor Walz has some connection with enforcement of the EOs he issued during the COVID-19 pandemic such that the connection-with-enforcement element of the *Ex parte Young* doctrine is satisfied. *See Heights Apartments, LLC v. Walz*, __ F. Supp. 3d __, 2020 WL 7828818, at *6 (D. Minn. Dec. 31, 2020) (concluding Governor Walz was not subject to sovereign immunity as he "issued the EOs and continues to extend the peacetime emergency that keeps the EOs in effect"); *cf. Minn. RFL Republican Farmer Labor Caucus v. Freeman*, No. 19-cv-1949 (ECT/DTS), 2020 WL 1333154, at *3 (D. Minn. Mar. 23, 2020) (addressing Governor Walz's connection with enforcement to challenged Minnesota election statute).

Governor, that authority is a "safety-valve alternative[]" for use in extreme cases of prosecutorial inaction." But *Otis* is inapposite. In *Otis*, the Minnesota Supreme Court held that a private citizen could not commence and maintain private prosecutions for alleged violations of criminal law. 257 N.W.2d at 363. And although *Otis* describes Minn. Stat. § 8.01 as a "safety-valve alternative[]," the court "merely cite[d] this statute as one of the possible alternatives available in the case of allegedly unjustified prosecutorial inaction." *Id.* at 365. Nothing about the *Otis* holding confines Minn. Stat. § 8.01 to be a "safety-valve alternative[]." *Id.* And, most importantly, neither does the plain language of Minn. Stat. § 8.01. Accordingly, the first element of the *Ex parte Young* doctrine is satisfied as to both Governor Walz and Attorney General Ellison.

### 2.  About to Commence Proceedings

Defendants next argue that both Governor Walz and Attorney General Ellison are immune from suit because neither official has threatened or is about to commence a lawsuit against Plaintiffs. Plaintiffs counter that this element of the *Ex parte Young* doctrine is satisfied as to both Governor Walz and Attorney General Ellison.

"[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, *and who threaten and are about to commence proceedings*, . . . may be enjoined by a Federal court of equity from such action." *Ex parte Young*, 209 U.S. at 155–56 (emphasis added). But "conjectural injury cannot warrant equitable relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992). The about-to-commence-proceedings requirement prevents federal courts from having "to

12

determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable." *Id.*

Defendants do not dispute that Attorney General Ellison has enforced the EOs that Governor Walz issued on at least one occasion. As such, a "demonstrated willingness" to enforce the EOs exists. *281 Care Comm.*, 766 F.3d at 797 (quoting *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014)). The enforcement of the EOs, therefore, is not merely conjectural or hypothetical. On a motion to dismiss, the Court considers whether Governor Walz and Attorney General Ellison are potentially proper defendants. *See 281 Care Comm.*, 638 F.3d at 626, 632 (addressing *Ex parte Young* doctrine at motion-to-dismiss stage). This Court joins at least one other in this District in concluding that neither Governor Walz nor Attorney General Ellison is subject to sovereign immunity as related to the EOs. *Heights Apartments*, 2020 WL 7828818, at *6. At this stage in the litigation, the Eleventh Amendment does not provide Governor Walz and Attorney General Ellison, in their official capacities, immunity from suit to the extent Plaintiffs seek prospective or injunctive relief.

In summary, Defendants' motion to dismiss this case on sovereign-immunity grounds is granted in part and denied in part. To the extent that Plaintiffs seek retroactive or monetary relief, Defendants in their official capacities are immune from suit and Defendants' motion to dismiss is granted. However, to the extent that Plaintiffs seek prospective or injunctive relief, at this stage in the litigation Defendants, in their official capacities, are not immune from suit and Defendants' motion to dismiss is denied.

### B.    *Pennhurst* Doctrine

Defendants argue that the *Pennhurst* doctrine bars Plaintiffs from seeking relief against state officials on the basis of state law in federal court.

In *Pennhurst State School and Hospital v. Halderman*, the Supreme Court explained that the *Ex parte Young* doctrine, which abrogates Eleventh Amendment sovereign immunity for state officials, rests on a legal fiction designed to reconcile the supremacy of federal law with the constitutional immunity of states.  465 U.S. at 105.  But when relief, whether prospective or retrospective, is sought against state officials in federal court based on state law, such reconciliation is not at issue.  *Id.*; *see Minn. Voters All.*, 2020 WL 5869425, at *7 (addressing and applying *Pennhurst* doctrine).  For that reason, the Supreme Court declined to extend the *Ex parte Young* doctrine to circumstances where plaintiffs seek relief against state officials in federal court on the basis of state law.  *Pennhurst*, 465 U.S. at 106.

Here, Plaintiffs' prayer for relief seeks "[a] declaration that Governor Walz did not have the statutory authority to declare an emergency that invoked Chapter 12 of the Minnesota Statutes . . . and that the Attorney General does not have the authority to prosecute violations of the EOs using that authority."  This claim for relief appears to pertain to all counts of the complaint.  But such a declaration, if granted, constitutes relief sought against state officials in federal court on the basis of state law, which is barred by the *Pennhurst* doctrine.  *See Heights Apartments*, 2020 WL 7828818, at *7 (applying

*Pennhurst* doctrine to state-law claims challenging Governor Walz's EOs); *see also Minn. Voters All.*, 2020 WL 5869425, at *7 (similar).

Accordingly, to the extent that Plaintiffs' claims are premised on state law, Defendants in their official capacities are immune from suit. Those state-law claims are, therefore, dismissed.

### C.    Qualified Immunity

Defendants next argue that Governor Walz, to the extent that he is sued in his individual capacity, is subject to qualified immunity. Plaintiffs disagree.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). On a motion to dismiss, qualified immunity warrants dismissal "only when the immunity is established on the face of the complaint." *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996) (internal quotation marks omitted). To determine whether an official is entitled to qualified immunity, courts consider "(1) whether the facts alleged or shown, construed most favorably to the plaintiffs, establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013). A court may consider these qualified-immunity factors in any order. *Pearson*, 555 U.S. at 236.

Defendants argue that Plaintiffs fail both prongs of the qualified-immunity test—that Plaintiffs have neither alleged a violation of a constitutional right nor set forth that the right was clearly established at the time of the alleged violation.  The Court first considers whether a clearly established right existed at the time of Defendants' conduct.

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted).  When performing a qualified-immunity analysis, a district court assesses the facts as they appeared to the relevant state actors.  *Greinder v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994).  A "clearly established" right does not require a case directly on point.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Rather, the key inquiry is whether the state actor had fair warning that the conduct violated a right.  *Id.* The Supreme Court has cautioned against defining "clearly established right" with an excessive degree of generality.  *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). "[C]learly established law must be particularized to the facts of the case."  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted).

To prove that the law was clearly established at the time that Governor Walz allegedly violated Plaintiffs' constitutional rights of free-exercise, free-speech, free-assembly, property, and equal-protection, Plaintiffs "must point to existing circuit precedent that involves sufficiently similar facts to squarely govern the individual defendants' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present a robust consensus of persuasive authority constituting settled law."

*Bus. Leaders in Christ v. Univ. of Iowa*, __ F.3d __, 2021 WL 1080556, at *9 (8th Cir. Mar. 22, 2021) (internal quotation marks and brackets omitted); *accord Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019) (addressing qualified immunity in the context of a motion to dismiss).

Here, Plaintiffs have not identified any existing circuit precedent involving sufficiently similar facts to squarely govern the conduct of Governor Walz in his individual capacity. Plaintiffs have not clearly defined the scope of the constitutional rights that they allege have been violated, let alone tied those allegations to binding Eighth Circuit precedent or a robust consensus of persuasive authority involving sufficiently similar facts. Governor Walz issued executive orders in the midst of a novel global pandemic. Certainly, the existence of an ongoing pandemic does not eradicate constitutional rights. But when assessing the facts as they appeared to state actors, *Greinder*, 27 F.3d at 1354, ignoring this unprecedented context would result in defining constitutional rights with an excessive degree of generality, *see Plumhoff*, 572 U.S. at 779. As such, it is not clear that Governor Walz had fair warning that the EOs violated Plaintiffs' rights, if they in fact do so. *See Hope*, 536 U.S. at 741; *see, e.g.*, *Wood v. Moss*, 572 U.S. 744, 759–63 (2014) (context of Secret Service members favoring presidential supporters in crowd considered novel and qualified immunity precluded First Amendment claims).

For these reasons, existing precedent did not clearly establish Plaintiffs' rights at the time of the alleged violations so as to put Governor Walz's conduct beyond debate.[8]

Therefore, Governor Walz is subject to qualified immunity from suit in his individual capacity. To the extent Defendants seek money damages against Governor Walz in his individual capacity, Governor Walz is immune from such claims.

In summary, Defendants' motion to dismiss on the basis of qualified immunity is granted as to Governor Walz in his individual capacity.

## III.   Abstention

This Court should abstain from considering this case, Defendants argue, because Counts One through Three of the complaint "revolve around the assertion" that Governor Walz did not have the authority to issue the EOs and Minnesota state courts are considering this "novel" issue of state law. Abstention is proper under either *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), or *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), Defendants maintain. What is unclear, however, is whether Defendants contend that abstention is proper as to the state-law claims, the federal-law claims, or both. As addressed above, Defendants in their official capacities are immune from Plaintiffs' state-law claims because of the *Pennhurst* doctrine. Consequently, this Court need only determine whether it should abstain from deciding the federal-law claims

---

[8]     In light of this conclusion, the Court need not address whether Plaintiffs have alleged that Governor Walz, in his individual capacity, violated Plaintiffs' constitutional rights.

under either the *Pullman* abstention doctrine or the *Colorado River* abstention doctrine. Arguments relating to these abstention doctrines are addressed in turn.

### A.   *Pullman* Abstention

Defendants argue that "Plaintiffs' [complaint] raises novel questions regarding the scope of the Governor's authority during a public-health emergency" and that state-court cases challenging the Governor's statutory authority to issue the EOs might "obviate entirely" the need for this Court to determine whether EO 20-74 violated Plaintiffs' constitutional rights. For this reason, Defendants argue, this Court should abstain under the *Pullman* abstention doctrine pending the conclusion of the state-court proceedings. Plaintiffs counter that EO 20-74 cannot be construed in a way that avoids the federal constitutional questions raised in this lawsuit. At oral argument, Plaintiffs also argued that, in the absence of a controlling question of state law, the Court is not precluded from addressing the federal questions raised.

The *Pullman* abstention doctrine provides that a federal court may abstain from deciding a "substantial federal constitutional question" if a "difficult and unsettled question[] of state law must be resolved." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984); *Pullman*, 312 U.S. at 498, 500–01. *Pullman* abstention is appropriate when the challenged state statute is unclear and may be construed by state courts to avoid or modify the federal constitutional question. *Harman v. Forssenius*, 380 U.S. 528, 534–35 (1965); *see also Pullman*, 312 U.S. at 498 (concluding federal court abstention is proper when a "definitive ruling on the state issue would terminate the controversy"). The Supreme Court

has "frequently emphasized that abstention is not to be ordered unless the state statute is of an uncertain nature, and is obviously susceptible of a limiting construction." *Zwickler v. Koota*, 389 U.S. 241, 251 n.14 (1967).   By contrast, if the state statute is clear and unambiguous, then a federal court must exercise its proper jurisdiction.  *See Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971); *Harman*, 380 U.S. at 534–35 (concluding abstention is improper when the relevant state statutes are "clear and unambiguous in all material respects").  "Abstention is, of course, the exception and not the rule . . . ." *City of Houston v. Hill*, 482 U.S. 451, 467 (1987).  Therefore, a court should not invoke abstention except in "rare" circumstances.  *Growe v. Emison*, 507 U.S. 25, 32 (1993).[9]

Here, *Pullman* abstention is improper for at least two reasons.  First, Defendants fail to identify which Minnesota statute or statutes are relevant.  It is not the Court's task to pick, choose and analyze whether a Minnesota statute might be dispositive as to the issues here.  Second, because Defendants have not identified what Minnesota statutes are relevant, this Court also cannot conclude that there are Minnesota statutes that are ambiguous but otherwise capable of a limiting construction that would clearly obviate the need for federal constitutional interpretation.  If the challenged statute is unambiguous, there is no need to abstain, even if state courts have not previously interpreted the statute.  *Hill*, 482 U.S. at 468; *see Midkiff*, 467 U.S. at 237 (observing that "the relevant inquiry is not whether there

---

[9]    Moreover, the nature of the claims raised under the First Amendment weigh against abstention. *Dombrowski v. Pfister*, 380 U.S. 479, 489–90 (1965).  "In such case[s] to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right [the plaintiff] seeks to protect." *Zwickler*, 389 U.S. at 252.

is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary"). Moreover, although Defendants argue that Minnesota courts have not had the opportunity to interpret "the scope of the Governor's authority during a public-health emergency," federal abstention is not warranted merely because litigation over the same subject matter is pending simultaneously in federal and state courts. *See, e.g.*, *Farms v. Kuehl Poultry LLC*, No. 19-cv-3040 (ECT/BRT), 2020 WL 2490048, at *5 (D. Minn. May 14, 2020) (citing *Growe*, 507 U.S. at 32).

For these reasons, abstention under the *Pullman* doctrine is not appropriate here. Accordingly, Defendants' motion to dismiss on this basis is denied.

### B.    *Colorado River* Abstention

Defendants also argue that the *Colorado River* abstention doctrine warrants dismissal of this case because there are "at least two pending state court actions that raise identical issues" as to the Governor's authority to issue the challenged EOs. Plaintiffs counter that abstention under the *Colorado River* abstention doctrine is inappropriate here.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction" they are given. *Colo. River*, 424 U.S. at 817. Notwithstanding this obligation, a federal court can abstain under *Colorado River* when (1) parallel state and federal actions exist *and* (2) exceptional circumstances warrant abstention. *Cottrell v. Duke*, 737 F.3d 1238, 1244–45 (8th Cir. 2013). State and federal cases are parallel when there is "a *substantial likelihood* that the state proceeding will *fully dispose* of the claims presented in federal court." *Id.* at 1245 (emphasis added) (internal quotation marks omitted). "The pendency

of a state claim based on the same general facts or subject matter as a federal claim and involving the same parties is not alone sufficient" for *Colorado River* abstention. *Fru-Con Constr. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 535 (8th Cir. 2009).

Here, Plaintiffs' claims raise questions as to whether Governor Walz has the authority to issue EOs and whether those EOs comport with federal law. Defendants argue that "identical issues" as to Governor Walz's authority are raised in two pending state-court actions. But for at least two reasons it is not certain that the state proceedings have or will fully dispose of the claims, in particular the federal-law claims, presented here. First, the two state-court proceedings that Defendants identify involve entirely different parties other than Governor Walz in one case and Attorney General Ellison in the other case.[10] Second, one state proceeding seeks an entirely different form of relief, a writ of *quo warranto*, which is not sought here; and the other state proceeding involves Minnesota seeking to enjoin a restaurant re-opening. These differences create doubt as to whether the proceedings are indeed parallel. And when there is doubt as to whether the state and federal proceedings are parallel, abstention under *Colorado River* is improper. *Fru-Con*, 574 F.3d at 535. For these reasons, Defendants' motion to dismiss on the basis of *Colorado-River* abstention is denied. In summary, Defendants' motion to dismiss on abstention grounds is denied.

---

[10] *Free Minn. Small Bus. Coal. v. Walz*, No. A20-0641, 2020 WL 2745414 (Minn. Ct. App. May 26, 2020) (unpublished); *State v. Schiffler*, No. 73-CV-20-3556, 2020 WL 2576304 (Minn. Dist. Ct. May 18, 2020).

## IV.    Failure to State a Claim

Defendants also move to dismiss Plaintiffs' complaint for failure to state a claim on which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A plaintiff need not *prove* its case at the pleading stage, nor do the pleadings require detailed factual allegations to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 805 (8th Cir. 2012) (observing that "specific facts are not necessary" and pleadings "need only give the [opposing party] fair notice of what the claim is and the grounds upon which it rests" (internal quotation marks omitted)).  To survive a motion to dismiss, a complaint must allege sufficient facts to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  Factual allegations that raise only a speculative right to relief are insufficient. *Twombly*, 550 U.S. at 555.  A district court accepts as true all of the plaintiff's factual allegations and views them in the light most favorable to the plaintiff. *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).  But legal conclusions couched as factual allegations are not accepted as true. *Twombly*, 550 U.S. at 555.  Also, mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" fail to state a claim for relief. *Id.*

Defendants first argue that the constitutional analysis here is governed by *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and mandates dismissal of all counts of the

complaint.  Defendants argue, in the alternative, that even if Plaintiffs' claims are analyzed

under the traditional tiers of constitutional scrutiny, Plaintiffs' claims fail rational-basis

review.  Defendants' arguments are analyzed in turn.

> **A.**    ***Jacobson v. Massachusetts***

Defendants argue that this Court should analyze Plaintiffs' constitutional claims

applying the framework set forth in *Jacobson v. Massachusetts.*  Plaintiffs counter that the

traditional tiers of constitutional scrutiny apply.

*Jacobson* involved a constitutional challenge to a Massachusetts law requiring all

persons over the age of 21 to receive a smallpox vaccine or pay a fine.  197 U.S. at 12.  The

Supreme Court held that judicial review of legislative action involving "a matter affecting

the general welfare" is proper only if (1) "a statute purporting to have been enacted to

protect the public health . . . has no real or substantial relation to those objects," or (2) the

statute "is, beyond all question, a plain, palpable invasion of rights secured by the

fundamental law."  *Id.* at 31.

Early in the COVID-19 pandemic, the United States Court of Appeals for the Eighth

Circuit interpreted *Jacobson* to mean that state action in the context of a public-health crisis

is susceptible to constitutional challenge only when the action fails the *Jacobson* test.  *In

re Rutledge*, 956 F.3d 1018, 1027 (8th Cir. 2020).  In *In re Rutledge*, a case challenging

abortion restrictions that the State of Arkansas imposed in response to the COVID-19

pandemic, the Eighth Circuit held that the district court abused its discretion when it did

not "meaningfully apply the Supreme Court's [*Jacobson*] framework for reviewing

constitutional challenges to state actions taken in response to a public health crisis." *Id.* The Eighth Circuit then applied *Jacobson* to the dispute. *Id.* at 1028–32.

The Supreme Court has subsequently held, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, that the Governor of the State of New York's restrictions on religious services must be enjoined. 141 S. Ct. 63 (2020). *Roman Catholic Diocese* involved a free-exercise challenge to executive orders limiting attendance at any religious service to 10 people in locales designated as "red zones" and 25 people in locales designated as "orange zones." *Id.* at 66. The Supreme Court concluded that a challenge to the executive orders as unconstitutional likely would succeed on the merits. *Id.* Notably, the majority in *Roman Catholic Diocese* did not apply the *Jacobson* framework when analyzing the constitutionality of the executive orders in question. Instead, the majority opinion applies the traditional tiers of constitutional scrutiny. *Id.* at 66–67. Following the Supreme Court's decision in *Roman Catholic Diocese*, numerous courts have concluded that the traditional tiers of constitutional scrutiny apply. *See, e.g.*, *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020); *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232 (9th Cir. 2020) (applying strict scrutiny to First Amendment claims); *see also Bayley's Campground Inc. v. Mills*, 463 F. Supp. 3d 22, 32 (D. Me. 2020) (rejecting *Jacobson* standard); *cf. Kentucky v. Beshear*, 981 F.3d 505, 509 (6th Cir. 2020).

Based on the Supreme Court's recent application of traditional tiers of constitutional scrutiny in *Roman Catholic Diocese*, the Court concludes that *Jacobson* does not replace

the traditional tiers of constitutional scrutiny.   Accordingly, the traditional tiers of constitutional scrutiny are applied here.

### B.        Free-Exercise Claim (Count One)

Defendants seek to dismiss Plaintiffs' free-exercise claim.  To successfully plead and prove a violation of the Free Exercise Clause of the First Amendment, Plaintiffs must establish that the governmental activity at issue places a substantial burden on their religious practice.  *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).  One's free-exercise right is substantially burdened when a regulation "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a person's individual religious beliefs; . . . meaningfully curtail[s] a person's ability to express adherence to his or her faith; or den[ies] a person reasonable opportunity to engage in those activities that are fundamental to a person's religion."  *United States v. Ali*, 682 F.3d 705, 709–10 (8th Cir. 2012) (internal quotation marks omitted).

The Free Exercise Clause requires that statutes be neutral and generally applicable. An incidental burden on religion, however, typically is insufficient to constitute a free-exercise claim.  *Emp. Div., Dep't of Human Servs. v. Smith*, 494 U.S. 872, 878 (1990); *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir. 1991).  Any restriction on the free exercise of one's faith that is not neutral and generally applicable must be narrowly tailored to serve a compelling government interest.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  Facial neutrality is not

determinative, however, if the "object or purpose of a law is the suppression of religion or religious conduct." *Id.* at 533.

Defendants present two arguments as to why EO 20-74 is facially neutral and generally applicable. First, Defendants argue that there is no evidence that religious discrimination motivated Governor Walz's EOs. But the Free Exercise Clause demands more than the absence of discriminatory animus against religion. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008). The Free Exercise Clause demands neutrality. *Id.* Therefore, the mere absence of religious animus does not render EO 20-74 neutral and generally applicable.

Second, while acknowledging that EO 20-74 treats religious services differently from critical businesses, Defendants argue that the EOs are neutral and generally applicable because religious services are treated in the same manner as restaurants, bars, and other public accommodations. And for this reason, Defendants contend, the EOs survive rational-basis review. Plaintiffs disagree. Maintaining that the EOs are not facially neutral, Plaintiffs argue that the EOs are subject to strict scrutiny, which the EOs cannot withstand.

Neutral laws of general applicability are subject to rational-basis review. *Doe v. Parson*, 960 F.3d 1115, 1119 (8th Cir. 2020) (citing *Church of the Lukumi*, 508 U.S. at 544). When considering whether a law is neutral and generally applicable, courts consider whether comparable activities are treated similarly. *Compare Mitchell v. Newsom*, __ F. Supp. 3d __, 2020 WL 7647741, at *4–5 (C.D. Cal. Dec. 23, 2020) (observing that "tattoo parlors are not singled out for differential treatment among like businesses, such as hair

and nail salons, in which close contact between individuals is necessitated by the nature of the business" and concluding that rational basis review applied), *with Calvary Chapel Dayton Valley*, 982 F.3d at 1233 (noting that casinos, bowling alleys, restaurants, and other "similar secular entities" were limited to 50 percent of fire-code capacity but houses of worship were limited to 50 people, regardless of fire-code capacity, and applying strict scrutiny).

Disparate treatment of religion, however, triggers strict scrutiny review, *see Roman Catholic Diocese*, 141 S. Ct. at 67, and some federal courts have considered a relatively broad category of secular actors in order to determine whether a challenged EO is neutral and generally applicable, *see, e.g.*, *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F. 3d 477, 482 (6th Cir. 2020), *reh'g denied* (Jan. 6, 2021) (applying strict scrutiny after concluding that restrictions closing all schools, including parochial schools, were not generally applicable when offices, tanning salons, and casinos were open); *S. Bay United Pentecostal Church v. Newsom*, __ F. Supp. 3d __, 2020 WL 7488974, at *8 (S.D. Cal. Dec. 21, 2020) (applying strict scrutiny because "retail establishments" were open at a greater capacity than religious services).

EO 20-74 subjects religious gatherings to the same occupancy restrictions imposed on funerals, weddings, restaurants and bars.  Defendants argue that these limitations are based on the information known about how COVID-19 spreads.  The parties do not dispute that some businesses—namely those that the State of Minnesota considers "Critical"—are not subject to the 50-percent capacity limit, with a maximum of 250 persons, that religious

services are subject to.[11]   And it appears that "Non-Critical" businesses also may be able

to operate without capacity restrictions, if these businesses comply with sanitation and

social distancing measures outlined by the Minnesota Department of Health.   However, at

this stage of its development, the record is unclear as to whether any of these businesses

are comparable to religious services and are therefore improperly receiving favorable

treatment.   Given both the rapid evolution of the law addressing many of the free-exercise

issues raised here, and the accompanying uncertainty as to whether religious services are

receiving disfavored treatment in relation to comparable secular activities, the Court

declines to dismiss Plaintiffs' free-exercise claim at this stage in the proceedings.

Therefore, Defendants' motion to dismiss Plaintiffs' free-exercise claim, Count

One, is denied.

### C.     Freedom-of-Speech and Freedom-of-Assembly Claim (Count Two)

Defendants seek to dismiss Plaintiffs' freedom-of-speech claim.   Here, Count Two

of Plaintiffs' complaint states that "[p]rohibiting or punishing [the Faith-Based Plaintiffs']

religious speech . . . does not serve any legitimate, rational, substantial, or compelling

government interest," but otherwise includes no factual allegations pertaining to Plaintiffs'

speech.   Such sweeping and conclusory allegations cannot survive a motion to dismiss.

---

[11]     It appears that pursuant to EOs 21-01, 21-11, and 21-12, religious gatherings are no longer subject to an occupancy limit.   However, it does appear that houses of worship must develop and implement a "COVID-19 Preparedness Plan," pursuant to applicable guidance from the State of Minnesota.

*See Twombly*, 550 U.S. at 555.  Therefore, Defendants' motion to dismiss Plaintiffs' free-speech claim is granted.

Defendants also move to dismiss Plaintiffs' freedom-of-assembly claim.  Plaintiffs' complaint alleges that EO 20-74's capacity restrictions on religious services violate Plaintiffs' right to peaceably assemble under the First Amendment.  Both parties fail to distinctly address Plaintiffs' freedom-of-assembly claim in their briefing on Defendants' motion to dismiss, however.  Instead, the arguments of both parties congregate around Plaintiffs' free-exercise claim.  Without a specific argument addressing Plaintiffs' freedom-of-assembly claim, this Court cannot conclude that Plaintiffs have failed to state a freedom-of-assembly claim.  Accordingly, Defendants' motion to dismiss Plaintiffs' freedom-of-assembly claim in Count Two is denied.

### D.     Equal-Protection Claim (Count Three)

In seeking to dismiss Plaintiffs' equal-protection claim, Defendants argue that Plaintiffs fail to establish that entities treated differently under the EOs are similarly situated.  Defendants also argue that any distinctions the EOs make between entities withstand rational-basis review.[12]  Plaintiffs disagree, arguing that the EOs "discriminate without any rational justification."

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S.

---

[12]     Defendants also seek to dismiss Plaintiffs' equal-protection claim on the basis that such a claim is not recognized under *Jacobson*.  But, as addressed in Part IV.A., *Jacobson* does not govern this Court's analysis.

Const. amend. XIV, § 1.  To establish an equal-protection violation, a plaintiff must show that it was treated differently than another who was in all relevant respects similarly situated.  *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 820 (8th Cir. 2011).  A plaintiff's failure to demonstrate that it is "similarly situated to those who allegedly receive favorable treatment" precludes the viability of an equal-protection claim because the Equal Protection Clause does not preclude dissimilar treatment of dissimilarly situated entities. *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994); *see also Roark v. City of Hazen*, 189 F.3d 758, 761–62 (8th Cir. 1999) (holding that plaintiff's equal-protection claim failed because no evidence of dissimilar treatment of similarly situated individuals was presented).  Accordingly, the threshold inquiry is whether the Plaintiffs are similarly situated to any entity or person allegedly receiving favorable treatment under EO 20-74.

Here, the complaint alleges that "EO 20-74 treats Plaintiffs and their businesses differently from other businesses."  But the complaint itself highlights numerous distinctions between Plaintiffs and the entities or persons allegedly receiving favorable treatment—for example whether the businesses are indoors or outdoors or provide services for people or animals.  And although Plaintiffs allege, for instance, that two stores are similar because they both sell Hallmark cards, outside of conclusory allegations, Plaintiffs have failed to allege that they are similarly situated *in all relevant respects* to any entity or person allegedly receiving favorable treatment under EO 20-74.

The parties disagree as to whether the criteria the EOs use to distinguish between entities is rational.  Plaintiffs' principal assertion appears to be that the capacity to social

distance is the relevant basis for comparison. Defendants appear to argue that the goods or services an entity provides, or the COVID-19 exposure risks in doing so, are the relevant bases of comparison. Accordingly, Plaintiffs appear to challenge the criteria on which Defendants base those distinctions. But Plaintiffs' apparent disagreement with the method by which EO 20-74 classifies entities and persons is relevant to whether the distinctions are rationally related, not whether the entities are similarly situated in the first instance. Because Plaintiffs have not established that Plaintiffs and the entities or persons allegedly receiving favorable treatment are similarly situated in all relevant respects, Plaintiffs have failed to state an equal-protection claim.

Plaintiffs also argue that Attorney General Ellison has selectively enforced the EOs. Defendants counter that the selective-enforcement arguments raised in Plaintiffs' opposition brief constitute an improper attempt by Plaintiffs to expand their equal-protection claims. Parties seeking leave to file an amended complaint must comply with Rule 15, Fed. R. Civ. P. Pleadings cannot be expanded via an opposition memorandum. *See Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss. To hold otherwise would mean that a party could unilaterally amend a complaint at will, even without filing an amendment, . . . simply by raising a point in a brief." (internal quotation marks and citations omitted)).

The complaint before the Court does not allege selective enforcement. Moreover, throughout their briefing, Plaintiffs allege facts that were not included in the complaint to

advance their selective-enforcement argument.  Such actions are an improper attempt to expand the scope of the pleadings without seeking leave to amend.  Accordingly, Plaintiffs' selective-enforcement argument is rejected.

For these reasons, Defendants' motion to dismiss Plaintiffs' equal-protection claim is granted.

### E.   Takings Claim (Count Four)

Defendants move to dismiss Plaintiffs' takings claim for failure to state a claim on which relief can be granted.  The Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation."  U.S. Const. amend. V.  The Supreme Court has recognized two types of takings: (1) categorical takings, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); and (2) regulatory takings, *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

To proceed with a takings claim, a plaintiff must have a property interest protected by the Fifth Amendment.  *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–03 (1984)).  Here, Plaintiffs allege that the EOs constitute a taking of property "in the form of [Plaintiffs'] access to their physical property, total or substantial lost revenue, and goodwill."  Defendants do not dispute that Plaintiffs have established a protectable property interest.  As the threshold issue of Plaintiffs' property interests is undisputed, the parties'

arguments addressing whether the EOs constitute a categorical or regulatory taking are addressed in turn.[13]

### 1. Categorical Taking

Defendants argue that Plaintiffs fail to state a categorical takings claim because temporary property-use restrictions cannot form the basis of a categorical taking.

A categorical taking occurs when a regulation denies *all* economically beneficial or productive uses of land. *Lucas*, 505 U.S. at 1015. During the relevant period, Governor Walz issued EOs with restrictions on property. For example, EO 20-74 limits the number of patrons who may congregate in a business at one time. But Plaintiffs are able to conduct their businesses in some capacity under EO 20-74. Therefore, Governor Walz did not effectuate a categorical taking by issuing EO 20-74.

Plaintiffs argue that the earlier EOs constituted a categorical taking because those EOs prevented some businesses from being able to operate at all for a period of time. Here, *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* is instructive. 535 U.S. 302 (2002). In *Tahoe-Sierra*, a 32-month moratorium on development in the Lake Tahoe Basin temporarily, but entirely, foreclosed landowners' development of their property during the moratorium. *Id.* at 312. The Supreme Court held that this temporary moratorium did not constitute a categorical taking because the moratorium did not cause a

---

[13]     Because Governor Walz in his individual capacity is subject to qualified immunity and the *Ex parte Young* doctrine limits claims against government officials to declaratory and injunctive relief, Plaintiffs are not entitled to money damages. Accordingly, Plaintiffs' takings claim is limited to declaratory and injunctive relief.

"complete elimination of value" or a "total loss."  *Id.* at 341–42 (quoting *Lucas*, 505 U.S. at 1019–20.)

Here, some EOs temporarily, but entirely, foreclosed some Business Plaintiffs from utilizing their properties as intended.  But *Tahoe-Sierra* indicates that such actions do not constitute a categorical taking.  *Id.*  Moreover, the emergency context of the alleged temporary taking at issue here is relevant.  *See, e.g.*, *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 63 (3d Cir. 2013) (concluding that temporary closure of flea market due to presence of unexploded artillery shells did not constitute taking).  The temporary nature of the shutdowns combined with the emergency nature of the circumstances supports the conclusion that the EOs did not constitute a categorical taking.

Plaintiffs argue that *First English Evangelical Lutheran Church of Glendale v. Los Angeles County* supports the proposition that the now-rescinded EOs that prevented Plaintiffs entirely from operating their businesses constitute a categorical taking.  482 U.S. 304 (1987).  But because the facts and circumstances here are materially distinguishable, *First English* is inapposite.  In *First English*, a church owned a 21-acre parcel of land near a canyon.  *Id.* at 307.  After a natural disaster, Los Angeles County passed an ordinance forbidding construction on the property.  *Id.*  Because of the Los Angeles County ordinance, the property owners in *First English* would *never* be able to build a church on the land.  *Id.* at 307.  The Supreme Court held that the ordinance, which "denied [First English] all use of its property for a considerable period of years," was a taking that required just compensation.  *Id.* at 322.  By contrast, the EOs were temporary and did not bar the

Business Plaintiffs from ever operating their businesses normally. Because of this distinction, *First English* does not govern this Court's analysis.

Finally, Plaintiffs argue that *Kimball Laundry Co. v. United States* supports the proposition that the EOs that temporarily, but entirely, prevented Plaintiffs from operating their businesses are categorical takings. 338 U.S. 1 (1949). In *Kimball Laundry*, the United States took over a business to provide laundry services for the military during World War II. *Id.* at 3. With "no other means of serving its customers," Kimball Laundry was forced to suspend its business. *Id.* at 3, 12. Here, Defendants have not condemned, taken over, or repurposed any of the Business Plaintiffs' properties for government benefit. The Business Plaintiffs have other means of serving their customers. These distinctions are meaningful.

For these reasons, Plaintiffs have not established that actions taken under the EOs constitute categorical takings.

## 2.    Regulatory Taking

Defendants also move to dismiss Plaintiffs' claim that the EOs constitute a regulatory taking. When determining whether the government has effectuated a regulatory taking in violation of the Fifth Amendment, a court considers (1) the economic impact of the regulation on the person suffering the loss, (2) the extent to which the regulation interferes with distinct investment-backed expectations, and (3) the character of the government action. *Penn Cent.*, 438 U.S. at 124. Because Defendants appear to concede

that the first two factors fall in Plaintiffs' favor, and provide no argument to the contrary, only the third factor of the *Penn Central* test is at issue.

Defendants argue that the character of the government action, the third factor of the *Penn Central* test, favors Defendants because the EOs were issued to protect the public by minimizing the spread of the virus that causes COVID-19.  Here, Plaintiffs strongly disagree that the EOs promote the common good.  As such, Plaintiffs dispute that the third *Penn Central* factor favors Defendants.

A taking "may more readily be found when the interference with property can be characterized as a physical invasion by [the] government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  *Id.* (internal citation omitted); *accord Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 226 (1986).

Plaintiffs argue that the shutdowns did not balance the benefits and burdens of economic life to promote the common good.  "Rather, they prohibited Plaintiffs from doing business, while others were allowed to," Plaintiffs contend.  In Plaintiffs' view, their businesses were selectively forced to bear the economic cost of the COVID-19 pandemic.

Defendants counter that the EOs were designed to prevent harm from the deadliest pandemic in 100 years.  *See Penn Cent.*, 438 U.S. at 125 (recognizing decisions upholding land-use regulations by state tribunals based on reasonable conclusions relating to the promotion of general health, safety, and general welfare).  Although Plaintiffs dispute the precise lines that Defendants have drawn when attempting to slow the spread of COVID-

19 within Minnesota, courts within this District, presented with similar takings arguments relating to EOs issued by Governor Walz, have concluded that the EOs promote the common good. *See, e.g.*, *Heights Apartments*, 2020 WL 7828818, at *16 (stating that EOs are "precisely the kind of public program benefitting the common good that is not a compensable taking" and concluding that a temporary moratorium on evictions did not constitute a categorical or regulatory taking). Having performed an independent review and discerning no compelling rationale for ruling otherwise, this Court also concludes that promotion of the common good was the purpose of imposing the restrictions at issue here. Therefore, the character of the government action, the third factor of the *Penn Central* test, rests in Defendants' favor. Based on this balancing of the three regulatory-takings factors articulated in *Penn Central*, Defendants' restrictions imposed pursuant to the EOs do not constitute a regulatory taking. *See* 438 U.S. at 124.

In summary, because Plaintiffs fail to establish either a categorical or a regulatory taking, Defendants' motion to dismiss Plaintiffs' takings claim, Count Four, is granted.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss, (Dkt. 54), is **GRANTED IN PART AND DENIED IN PART** as follows:

1.     Defendants' motion to dismiss Plaintiffs' state-law claims based on sovereign immunity and Plaintiffs' federal-law claims seeking damages or retrospective relief is **GRANTED**.

2.      Defendants' motion to dismiss Count One is otherwise **DENIED**.

3.      Defendants' motion to dismiss the freedom-of-speech claim in Count Two for failure to state a claim is **GRANTED**.

4.      Defendants' motion to dismiss Plaintiffs' federal freedom-of-assembly claim in Count Two is **DENIED**.

5.      Defendants' motion to dismiss Counts Three and Four is **GRANTED**.


Dated:  March 30, 2021                                    s/Wilhelmina M. Wright
                                                          Wilhelmina M. Wright
                                                          United States District Judge